## WARNELL v. COMMONWEALTH.

Court of Appeals of Kentucky.

Feb. 8, 1952.

Paul R. Huddleston, Bowling Green, for appellant.

A. E. Funk, Atty. Gen., John Browning, Asst. Atty. Gen., for appellee.

MOREMEN, Justice.

Appellant, Glenn Warnell, was convicted of the murder of Mrs. Virgie Stone and given a sentence of life imprisonment. He assigns the following grounds for reversal: (1) insufficient proof of corpus delicti; (2) insufficient proof to support a conviction; (3) prejudicial, erroneous instructions; (4) failure to instruct on the whole law of the case; and (5) misconduct of the Commonwealth's attorney during the final argument. Since the vital question concerns whether appellant was convicted by the uncorroborated testimony of an accomplice, particularly in the establishment by the Commonwealth of the corpus delicti, we will outline the testimony without reference to the facts imposed by the accomplice, then piece into the jig-saw puzzle of evidence the portion given by him.

On a bitterly cold day in November, 1950, the frozen, swollen body of Virgie Stone was found on a private road that led to an uninhabited tenant house on the farm of Beckham Martin, Jr. She was lying in the center of the road on her stomach. She was clothed and her clothing had been disarranged by the wind. She wore a short scarf around her neck, and Martin, who found the body, stated that the scarf was worn in a normal position.

Two days before, on November 24, at about noon, appellant met his friend Roxy Bledsoe in Bowling Green. Bledsoe purchased a half pint of whiskey and they went to Wilson's Cafe and took a place at the bar. Soon Mrs. Stone entered the cafe, apparently under the influence of intoxicants, and sat at a table. They went to the table and joined her where all had drinks. In about 30 minutes, the men left, were gone some time and later returned to the saloon. Warnell went to the bar and Bledsoe sat at the table and drank with Mrs. Stone, who, in a short time, became very drunk. The proprietor told Bledsoe to remove her from the premises, and he did by practically dragging her to the outside where he placed her in a cab. The cab driver refused transportation and Bledsoe thereupon shoved her into the car belonging to Warnell. Warnell at first refused to drive her away, but later, at the suggestion of Wilson, agreed to do so in order that she wouldn't be arrested. The three got into the front seat of the car. They drove out of town on Highway 31 W where Bledsoe purchased another half pint of whiskey and when he returned, Bledsoe and Mrs. Stone got into the rear seat of the car. When they reached the Plum Springs Pike, Bledsoe requested that they turn off, which they did, because, as Warnell testified, Bledsoe wanted to have intercourse with her, but he did not stop the car. It was still daylight but the lights on his car were not good and Warnell wanted to get back to town before dark. They went out the road a piece and turned off, when Bledsoe said, "Just take us on up to the house then." They were then on the Flat Rock Road. When they reached the Beckham Martin place, he let them out and, while he was pulling away, a car passed. The man driving the car was Charles King, and he testified: "Well, we were starting down to Smiths Grove and as we passed by this lane there was a car facing us that we had to pass and as we were coming over a hill Warnell who was in the car pulled out directly in front of me and I passed him. Of course, we slowed down and I saw these two people, a man and a woman, at the road there inside the gate. At the time I didn't recognize Bledsoe. His back was facing us and she was facing us and his back was to us. He had her under her arm with his right hand and he was trying to hold her up."

He also testified that he could see her face at the time, that her head was erect, her eyes were open and she was not resting her head on his shoulder. In response to a question as to whether or not she was dead or alive at the time, he answered he did not know, and then stated, "Well, at the time, I thought she was drunk, a person that appeared to me to be passed out drunk." Beckham Martin, Jr., found the frozen body about 200 to 300 yards from this gate with the head pointed towards the vacant house. The scarf (the importance of this item will develop) was on the back of her head, knotted like one would normally wear it, and was not tied around her neck like a rope. Martin summoned the sheriff, Mr. Hodges, who brought the assistant to the coroner, Mr. Bradley, to the scene.

The sheriff stated that Mrs. Stone was a woman about 52 or 53 years old, whom he identified from a record in her pocketbook. He testified that her face and hands were black and that the assistant coroner pointed out to him that the scarf was pretty tight around her neck. He stated that he later recovered a watch which belonged to Mrs. Stone from Bledsoe's mother.

Henry W. Bradley, the assistant coroner, testified that he was a professional funeral director and embalmer and a graduate of an accredited school of embalming. He stated that: The body was frozen and the scarf "was around her neck very tight" as far as he could see at that time; the body was returned to the funeral home where they

waited several hours for it to thaw, when he made an examination of it. He then stated, "I discovered that this scarf was tightly knotted around her neck," and gave the opinion that from the appearance of the body and from marks that he found on the throat, death resulted from strangulation. He stated that her face was puffed and red and discolored, as were her hands.

A. J. Crow, a licensed embalmer, testified that he received the body of Mrs. Stone for preparation for burial. He made a thorough examination for signs of violence and found none. Her face, hands, and arms were swollen and badly discolored. He did not detect any bruises that might have been caused by something being tightly drawn around her neck and he partially removed the discoloration from her face, but there were no marks on her neck.

Dr. Louis Dickenson, a licensed physician since 1942, testified, "I found, of course, the body was thawed out, still cold but thawed out. The entire body appeared somewhat swollen under the skin. The face was dark purple splotched, not evenly purple but splotched. The margins of the ears were very dark purple, almost black. The hands particularly were dark purple in the entirety, the lower arms, and swollen. The toes somewhat the same way but not near as markedly purple and swollen. The nails on the fingers were black, not purple but they were obviously black. That's about all I could say. There were no external marks of violence other than a few scratch marks on her knees and lower extremities."

He stated that he thought her death was due to freezing and exposure to cold and, although he had seen the body after it had been embalmed, he found that it was still swollen and stated that swelling is not changed by embalming. He stated that there is a difference in the appearance of a body frozen while alive than where the body is frozen shortly after a person has been killed. He said, "The main difference is the change is made while the blood is still circulating and there are definite changes. If you freeze a steak in your frozen foodlocker, it doesn't change it, but if blood is circulating through that place, there are certain changes take place. It is different if circulation is not in existence."

It is suggested in the brief that in cases where a body is frozen after death from another cause, no swelling occurs and, while the doctor did not make this statement, it is apparent from his testimony that he considered it when reaching his conclusion that she was not dead when the freezing process began.

The foregoing, we believe, fairly states the testimony on the main issues without the testimony of the accomplice, but, in order to get the whole picture for the purposes of this opinion, we will piece into the pattern the salient parts of Bledsoe's testimony.

He stated that when the party turned off the main highway into the Plum Springs Pike and had driven a mile or two down that road, Warnell stopped and removed Mrs. Stone, who had passed out, from the front seat and put her in a reclining position on the back seat, and there had intercourse with her; that during the coition, Mrs. Stone wet on Warnell and he thereupon slapped her twice, grasped her scarf and twisted it hard about her neck; that she made a sound and Bledsoe told Warnell to quit but he replied, "If you don't hush, I'll give you the same dose"; that he thereupon returned to the front seat and told Bledsoe to get back with her. He found her dead, not breathing, her eyes closed, and her hands motionless. In response to Warnell's inquiry concerning a good place to put the body, Bledsoe suggested a deserted farm house in his neighborhood and they proceeded directly to that place, some eight or nine miles away. The two men took the woman's body from the car and carried it through the gate, but when Warnell saw another car coming, he dropped her and jumped into the car and took off. He, Bledsoe, dragged the body about 100 yards up the private road and just left her there and went on home. He stopped at the house of a neighbor who lived on the Beckham Martin place and left there after ten or fifteen minutes and arrived home at 4:30 p. m., did his milking and went to bed.

Several witnesses were introduced to show that Bledsoe had made contradictory statements after his arrest. The sheriff testified that he told him three different stories; that he told him he didn't know anything about the woman's watch but later it was found out that it had been given to his mother. The coroner, Mc-Clard, testified that he talked to Bledsoe in the county jail and he had stated that she was not dead at the time Warnell let them out of the car; that he left her in the snow because he was cold and tired of helping her along; that he intended to get a car and come back and get her but the person from whom he anticipated borrowing the car wasn't at home and his wife wouldn't let him have it.

The indictment in this case charged that appellant did "murder one Virgie Stone by strangling the said Stone about the neck with a scarf or other such weapon from which said strangulation the said Stone did then and there die." Without regard for the testimony of the accomplice, (the Commonwealth concedes that Bledsoe was an accomplice) the testimony indicates that Virgie Stone was alive when appellant was last with her. Appellant so states and the testimony of Charles King is in strong accord. No one attempts to rebut this testimony except Bledsoe. There is no competent proof to show that Virgie Stone was strangled to death, and proof of the body of the wrong as charged in the indictment is lacking.

■ As defined in Roberson's New Kentucky Criminal Law and Procedure, Second Edition, Sec. 282, the term, corpus delicti, means the fact that a crime has been committed by someone; and in murder has two components—death as a result, and the criminal agency of another as the means. Both of these must be established, or there can be no conviction. But the agency of the person accused of the murder is not an element and is merely a fact to be proved after the proof of the corpus delicti. If it were true that the corpus delicti included the fact that defendant was implicated in the crime as an element thereof, all that would be necessary to a conviction would be to prove the corpus delicti. Remember—the crime charged here is murder by strangulation with a scarf on the Plum Springs Pike, and all the proof, other than that of the accomplice, is that Mrs. Stone was alive when Warnell left her in the company of Bledsoe. This state of fact is quite different than if it had been shown that she was last seen in the company of Warnell. She was last seen in the company of Bledsoe, alive. There is nothing in the record tending to show that a crime was committed while Warnell was in her company except the evidence of the accomplice. She was last seen alive in the company of Bledsoe and if, in fact, she died by strangulation, it seems that Bledsoe should be charged by the suspiciousness of the circumstances.

■ The only trace of evidence which might tend to corroborate the story told by Bledsoe is the testimony of the witness Wilson that Warnell had a wet spot on his pants when he returned to the cafe from the Flat Rock Road—this condition was observed by no other person in the crowded cafe—and the opinion of the deputy coroner that death resulted from strangulation. Wilson's testimony would have meaning only when shaded into the background of Bledsoe's testimony; standing alone, it is valueless. By the deputy coroner's opinion, the Commonwealth attempted to prove a fact essential to its case. He stated that her neck showed "reddish purple marks, more or less like a rope burn or something of that nature." This statement as to a fact was competent and of value, but his conclusion as to the cause of her death was worthless, particularly as to the time when the alleged strangulation might have taken place. It was not shown that this deputy coroner, who had served for less than a year, had greater skill in drawing inferences from the facts than the tribunal before which the case was being tried, and, in any event, inferences may not be substituted for facts. The witness qualified as an accredited undertaker, but was not a witness skilled in medical science and we cannot give to his guesswork the dignity which should be accorded a witness skilled in such subjects.

In Denham v. Commonwealth, 239 Ky. 771, 40 S.W.2d 384, 386, where the evidence showed that a baby was born and was dead with an intervening period of life, and the defendant had motive and opportunity to have killed it, but there was no evidence that the child did not die a natural death, it was held insufficient to sustain a conviction of murder and we said: "Circumstantial evidence which is as consistent with the absence of a crime as with the perpetration of the crime is insufficient to prove the corpus delicti. Underhill, Criminal Evidence, § 37. The same wise rule applies in respect to the proof of commission of a crime. If the facts proven may be reasonably reconciled with the presumption of innocence of the accused, guilt is not established. Hill v. Commonwealth, 191 Ky. 477, 230 S.W. 910; Meyers v. Commonwealth, 194 Ky. 523, 240 S.W. 71; Miracle v. Commonwealth, 228 Ky. 591, 15 S.W.2d 429; Woodall v. Commonwealth, 230 Ky. 698, 20 S.W.2d 722."

■■ It is our opinion that this record does not furnish evidence that tends to corroborate the testimony given by the accomplice either as to the establishment of the corpus delicti or as proof of guilt of the appellant of the crime charged in the indictment. In fact, the evidence tends to corroborate the theory that she froze to death.

Under the second ground for reversal, appellant insists that instruction No. 2 should not have been given. This reads: "If the Jury believe from the evidence beyond a reasonable doubt that at the time and place referred to in the testimony the defendant, Warnell, without malice did wilfully and unlawfully abandon and expose the body of the above-named Virgie Stone in Warren County, Kentucky, at the time and place referred to in the testimony, under circumstances and conditions reasonably calculated to produce death from freezing in her then condition and from which exposure the said Virgie Stone did then and there or soon thereafter die, then and in that event the Jury shall find the defendant guilty not of murder, as set out in instruction No. 1, but of involuntary manslaughter as set out in this instruction, and in that event they shall fix his punishment at a fine in any sum in their discretion or confinement in the County Jail for any length of time in their discretion or both so fine and imprison him."

■ We concur in appellant's contention that where an indictment charges the killing in a particular manner, there can be no conviction for killing in a different manner. Lewis v. Commonwealth, 42 S.W. 1127, 19 Ky.Law Rep. 1139; Clark v. Commonwealth, 111 Ky. 443, 63 S.W. 740; Watts v. Commonwealth, 197 Ky. 101, 245 S.W. 884; Bradley v. Commonwealth, 218 Ky. 788, 292 S.W. 343. Since the indictment in this case charged murder by strangulation, it was a good defense to plead that the woman met death by freezing. The foregoing instruction has the effect of subjecting appellant to fine and imprisonment at the discretion of the jury for a defense which he was entitled to make to the indictment and was, we believe, highly prejudicial.

In view of the fact that the judgment is reversed, we will not discuss the other questions raised by appellant. The facts developed on a new trial may be different. However, all questions not decided are expressly reserved.

The judgment, therefore, is reversed.