Ted Mitchell JOHNSON, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 92–SC–150–DG.

Supreme Court of Kentucky.

May 27, 1993.

Rehearing Denied Sept. 30, 1993.

Richard Meena, Jr., Louisville, for appellant.

Chris Gorman, Atty. Gen., Lana Grandon, Asst. Atty. Gen., Criminal Appellate Div., Frankfort, for appellee.

COMBS, Justice.

Ted Mitchell Johnson, age seventeen at the time of the offenses charged, was tried as a youthful offender and convicted of rape in the first degree (Class B), sodomy in the first degree (Class B), sexual abuse in the first degree, and wanton endangerment in the second degree. Johnson was sentenced to the minimum 10 years. The Court of Appeals affirmed, and we granted discretionary review.

We have taken the liberty of reordering, slightly, the issues presented:

1) Whether the evidence was sufficient to support a guilty verdict on each count;

2) Whether hearsay testimony by the alleged victim was erroneously admitted;

3) Whether hearsay and irrelevant testimony by a certified clinical psychologist was erroneously admitted;

4) Whether the defendant was entitled to have the matter remanded to juvenile court;

5) Whether the prosecutor's closing argument unfairly prejudiced the jury; and

6) Whether the defendant was entitled to lesser-included-offense instructions on sexual misconduct and sexual abuse in the third degree.

The alleged victim of the sexual crimes was A., a fifteen-year-old female who, along with Johnson and about a dozen other teenaged juveniles, attended an unchaperoned New Year's Eve party at a private home on December 31, 1989–January 1, 1990. It appears from the evidence that most of the attendees consumed alcoholic beverages. A. apparently became intoxicated to the point of unconsciousness, and was never able to recollect the events complained of. She testified

that she had lost consciousness sometime before midnight, and had awoke at about 4:00 a.m., fully dressed except that her shoes and belt were missing and her bra was unfastened. Her only recollection of events during the interim was that at some point she had been on the bed with one C.G., kissing. She left the premises with her girlfriend, S.M., at about 6:30 a.m. A. discovered bruises on her neck and breast. S.M. suggested that A. and C.G. had engaged in sexual relations. Later that day, S.M. further informed A. that one S.S. had also had sex with her, and that Johnson had attempted to. When A. returned to school on January 4, she heard similar stories from other students.

S.M. was not an eyewitness to these events, but reported what she had deduced or had heard from others. Her actual observations were as follows. A. had become increasingly more inebriated, and had been helped to the bedroom, laid on the bed and left alone. S.M. had herself become intoxicated. "Quite a few people" had later entered the room, C.G. having gone in first, alone, staying about thirty minutes. C.G. had emerged from the room with a used condom, showing it to everybody. S.M. had then gone in to check on A., found her pants and underpants on the floor, and, assisted by two other girls, re-dressed her. At that point, A. was aware of their presence, talking in a slurred manner. S.M. had turned off the lights and closed the door. Later on, a "few guys" had gone into the room, after which S.M. had gone in and found A. unconscious and again undressed. Asked on cross-examination whether, based on her observations, she had suspected A. was "putting on" with respect to her degree of drunkenness, S.M. answered, "Yes."

J.D.N. testified that he had seen both C.G. and A. come out of the bedroom. A. had not appeared to be intoxicated at that point.

N.W. testified that A. and C.G. had gone into the bedroom at about 8:00 p.m., and had stayed about thirty minutes. A. had emerged from the room conscious, although somewhat intoxicated, and had talked with others at the party. At about 9:00 p.m., he said, A. had passed out (or so he had heard) and had been taken back to the bedroom.

N.W. had also been drinking. He testified that, the next morning, Johnson had told him of having intercourse with A.

S.I. testified that he had seen A. in the bedroom "out cold" with a number of boys present, including Johnson. He had seen Johnson taking off A.'s pants. Later he had heard Johnson say that he (Johnson) had had sexual intercourse with her. S.I. also said that he had seen A. engaging in fellatio with C.G. after his observation of Johnson.

S.P. testified that he had heard Johnson boasting of having had sexual relations with A., and that Johnson had also told him of having inserted a candy cane into her vagina.

J.W.N. testified that he, Johnson and several other boys had been in the darkened bedroom with A., who was unconscious. J.W.N. had consumed about six beers and was "pretty well drunk." Johnson, he said, had pulled up A.'s shirt and pulled down her pants. J.W.N. had seen Johnson on top of A., but had not observed actual intercourse.

C.G. testified that he had indeed engaged in intercourse with A., with her consent and cooperation, after which they had both returned to the party. He denied having had oral sex. He reported having seen nothing occur between A. and Johnson.

J.R. testified that A. had been apparently unconscious on the bed with six or seven others being present in the room (darkened except for light from a clock), and that Johnson had fondled her breasts and put his mouth to them. Johnson had attempted to have intercourse with her, but failed, being unable to attain erection. Johnson had then masturbated and had been teased about it by J.R. Johnson had gotten a revolver from a gun cabinet and pointed it at J.R. and J.B. The witness stated that bullets had fallen from the gun when Johnson tilted it upwards.

K.B. testified that he had seen A. go into the bedroom alone and close the door. C.G. had then gone into the room and, after about thirty minutes, C.G. and A. had emerged together. Later, seeing A. unconscious in the living room, K.B. had carried her to the bedroom, placed her on the bed, covered her, and left the room, turning off the lights and locking the door. Sometime later, he had

found the room unlocked, with Johnson and several other boys inside, A. lying unconscious on the bed, the lights off. Still later, he said, he had returned to the room to find her undressed from the waist down. He had seen Johnson on top of her and had seen him desist, masturbate, and get on top of her again. K.B. testified that he had witnessed actual penetration by Johnson. He had subsequently observed S.S. having intercourse with A. (after which the lights were turned on), and later had seen Johnson insert a candy cane and another object into her vagina, A. being unconscious throughout all these episodes.

J.B. testified that he had been in the room with A. along with seven or eight others. J.B. had not been drinking. Johnson and another boy had undressed themselves. Johnson had attempted intercourse with A., but failed, and had masturbated. J.B. had left the room, returning later to see S.S. getting up from on top of A. He had seen K.B. insert something into her vagina. In J.B.'s opinion, A. had been unaware of what was happening. Later, Johnson had pointed a gun in the direction of J.B. and some other boys, and had then opened the chamber, whereupon bullets had fallen from the gun.

S.S. testified that he had drunk two or three beers. He and a number of other boys had been in the room with A., who was drunk and apparently passed out. The lights were off, and the room was dark. He had seen Johnson undress A. and twice attempt intercourse, twice failing. Johnson had then put his face between her legs for "a couple of minutes," but the witness had not seen oral-genital contact.

The Commonwealth's witnesses also included (as the first witness) Dana Hardy, a Certified Clinical Psychologist with Autonomous Functioning in Clinical Psychology, to whom A. had gone for counselling. Hardy was permitted to testify over objection that A. had told her that, although having no recollection of it due to intoxication, she had been informed by a friend (who had in turn been informed by a fourth party) that two or more persons had engaged in sexual intercourse with her at the New Year's Eve party. Hardy went on to testify that A. had report-

ed being surprised by the information, feeling sad, and crying. A. did not believe her friend would lie to her. A. had reported that she'd had no prior sexual experience involving intercourse. Hardy had concluded that A. exhibited a dysphoric mood—characterized by depression, loss of appetite, difficulty in sleeping, negative self-image, feelings of humiliation, difficulty concentrating, and significant social withdrawal. Her emotional condition had led to declining academic performance. Hardy had diagnosed "major depression, single episode," and her course of treatment was counselling to assist A. in coping with the depression and the trauma. Although A. had shown some improvement, Hardy said, the approach of trial had been accompanied by increased fear, anxiety and other symptoms. Hardy expected A. to continue in therapy for about two years.

Dr. Patricia Elliot, who had examined A. after the alleged incident, testified that A.'s hymen had been patent and open. That condition would be consistent with penetration, but Dr. Elliot could render no conclusion as to the actual cause of the patency.

Johnson's testimony in defense was that A. had been drinking and, although not "really drunk," had become loud and obnoxious, whereupon he and A.'s girlfriend, S.M., had taken her to the bedroom. He had seen people going into the room. He had returned to the room, like "pretty much all the males," and had held A.'s legs while K.B. removed her pants. He had seen K.B. insert the candy cane. According to Johnson, he had been unable to attain erection and had been taunted by the other boys. He had approached A., but S.S. had gone to her instead. Johnson denied having had any sexual intercourse or sexual contact with A.

With respect to the firearm, Johnson testified that he had been incensed by the boys' fun-making about his inability to get an erection. He had gotten the gun from a cabinet and unloaded it, holding the ammunition in his left hand. After pointing the revolver at J.R., he had opened the cylinder and dropped the bullets from his left hand (apparently creating the impression that they had fallen from the gun).

## I.

■ The first issue on review is whether the trial court erred in denying defendant's motion for directed verdicts on all charges, made on grounds of insufficient evidence.

At least upon review, the issue is two-pronged. In argument before the trial court in support of its motion for directed verdicts, the defense maintained that the evidence was so confused and contradictory as to preclude a reasonable conclusion as to what had in fact occurred. We have summarized the testimony at length in order to illustrate that the trial court did not err in this regard. A number of eyewitnesses presented competent testimony sufficient to warrant fair inferences that Johnson was in the room (S.I., J.W.N., J.R., K.B., J.B., S.S.); that A. was unconscious (A., S.M., S.I., J.W.N., J.R., K.B.); that Johnson had been "on top" of her (J.W.N., K.B.), or had attempted intercourse (J.R., J.B., S.S.). One eyewitness (K.B.) reported having seen actual penetration, as well as insertion of the objects. Another eyewitness (S.S.) reported that Johnson had put his face between the victim's legs for a time. Three witnesses (N.W., S.I., S.P.) testified that Johnson had admitted to having had sexual relations with A. One witness (S.P.) testified that Johnson had admitted having inserted the candy cane. With respect to the endangerment charge, two eyewitnesses (J.R., J.B.) testified that Johnson had pointed the gun in their direction, after which they had seen him unload it.

Viewing the evidence in totality and favorably to the prosecution, it appears to us impossible to say that a reasonable juror could not believe beyond a reasonable doubt that Johnson was guilty of nonconsensual sexual intercourse, nonconsensual deviate sexual intercourse, nonconsensual sexual contact, and wanton endangerment. *Commonwealth v. Benham*, Ky., 816 S.W.2d 186 (1991).

■ In the second prong of this issue, we are confronted with a variance between the indictment and the proof. Johnson observes that the indictment specifically charged "use of forcible compulsion," and not physical helplessness of the victim, as constituting the lack-of-consent element of each sexual offense. While either condition would support the conviction, Johnson argues that, there being no evidence of forcible compulsion ("physical force or threat of physical force ... which places a person in fear ..."), the element as charged was not proven. He submits that the decision in *Warnell v. Commonwealth*, Ky., 246 S.W.2d 144 (1952), is dispositive.

Warnell had been indicted for the murder by strangulation of a woman whose frozen body was discovered outdoors on a bitterly cold day. The Commonwealth sought to prove that Warnell had strangled her, while the defense maintained that she had instead died of exposure to the cold after she and Warnell had parted company. Upon review of Warnell's conviction for murder, the court determined that, while there had been much evidence of death by exposure, and strong evidence that the victim had been alive when Warnell was last with her, there was "no competent proof to show that [the victim] was strangled to death, and proof of the body of the wrong as charged in the indictment is lacking." *Id.* at 147.

Johnson's principal point is that the *Warnell* opinion went on to hold that the trial court had also erred in instructing the jury that Warnell was guilty of involuntary manslaughter if he had abandoned the victim under conditions likely to produce death from freezing and in fact resulting in death. The appellate court concluded:

> [W]here an indictment charges the killing in a particular manner, there can be no conviction for killing in a different manner. Since the indictment in this case charged murder by strangulation, it was a good defense to plead that the woman met death by freezing. The foregoing instruction has the effect of subjecting appellant to fine and imprisonment at the discretion of the jury for a defense which he was entitled to make to the indictment and was, we believe, highly prejudicial.

*Id.* at 148 (citations omitted).

The prejudice to Warnell would be much more apparent to us had he been convicted under the manslaughter instruction rather than of murder by strangulation. Perhaps

the holding was admonitory in contemplation of a second trial. (Warnell was subsequently indicted and convicted as an accessory to wilful murder by means of deliberate exposure of the victim to freezing. *See Warnell v. Commonwealth*, Ky., 262 S.W.2d 683 (1953).) At any rate, Warnell presumably raised objection to the manslaughter instruction. It seems safe to assume that the defendant, charged with strangling the victim, had no notice of, and no opportunity to defend, the vastly different proposition that he had indeed not strangled her but had instead abandoned her in the cold. This proposition was not only foreign to the indictment, but was foreign also to the Commonwealth's theory and proof. (Recall that Warnell was convicted of murder by strangulation.) Finding Warnell guilty under the manslaughter instruction would indeed have been unfairly prejudicial.

■ *Warnell* is not viable authority for the proposition that reversal is required on purely technical grounds. In *Robards v. Commonwealth*, Ky., 419 S.W.2d 570 (1967), the court recognized that under modern rules the essential question when examining variance between the indictment and the proof is whether the defendant in fact had fair notice and a fair trial. Robards had been indicted for armed assault with intent to rob (KRS 433.140, repealed effective January 1, 1975), which offense could be accomplished in two different ways—by assault with an offensive weapon or instrument, or by demand for money in a forcible and violent manner. The indictment charged that Robards had "pointed a pistol, or some other object intended by him to simulate a pistol" at the victim. The proof was, however, that Robards had not been armed at all, but had merely had his hand in his pocket and demanded money. In addition to moving for directed verdict, the defense objected to an instruction under which guilt could be found upon a finding that the defendant had "in any forcible and violent manner demanded any money" from the victim.

Upon review, the court reasoned that the evidence was sufficient to support a conviction under that instruction, and that the instruction "could have been erroneous only on the theory that it did not follow the allegations of the indictment." *Id.* at 572. In affirming the conviction, the court concluded:

> The strict principle [that the evidence and instructions must be limited to the theory of the case set forth in the indictment] has necessarily been modified by the letter and spirit of the Rules of Criminal Procedure (effective January 1, 1963), which place more emphasis on fair notice and fair trial than upon rigid technicality. For example, an indictment may now be amended to conform to the evidence "if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced." RCr 6.16. And, as always, any "error, defect, irregularity or variance which does not affect substantial rights" will be disregarded as non-prejudicial and therefore harmless. RCr 9.24.
>
> The record discloses that Robards had an examining trial and heard the evidence that was later adduced against him at the trial. He was not misled, surprised or thrown off guard except insofar as he chose to shoot the gap in reliance upon a mere technical defect of which he was fully aware. The indictment could and should have been amended at the conclusion of the testimony, but it cannot reasonably be held that a failure in that respect affected the defendant's substantial rights.

*Id.* at 573.

The reasoning of *Robards* is appropriate to the present case. Here it is abundantly clear that the defense suffered (and asserts) no surprise or prejudice. The variance did not involve a different or additional offense. It was readily apparent to the defendant early on that the Commonwealth's thesis was that the sexual acts had occurred not through physical force or threat, but while the victim was physically helpless due to her consumption of alcohol. The juvenile complaints and petitions filed on February 8, 1990, all stated that the victim had been "incapable of consent and physically helpless due to alcohol intoxication," making no mention of forcible compulsion. After the indictment was returned, the defense moved for and the court ordered provision of a bill of particulars (including a demand for "factual statements of

the essential elements of the alleged offense"), which bill was furnished on August 3, 1990, well over three months in advance of trial. The bill of particulars stated that the "victim was passed out from alcohol intoxication at the time of the incident," intimating no element of forcible compulsion. The discovery order further directed the Commonwealth to permit inspection of any written statements of witnesses, of which there were many referring to A.'s drunkenness and/or unconsciousness, and none referring to any element of physical force. (It is unclear from the record whether the Commonwealth complied with the latter portion of the order, but there appears no objection or further demand for relief by the defense.) Moreover, the defense did not object to the jury instructions, which made no mention of forcible compulsion, but did define "physically helpless" and did require for a guilty verdict a finding that A. had been physically helpless at the time of the sexual acts. Furthermore, the defense did not call to the trial court's attention the variance between the indictment and the proof. As in *Robards,* the indictment here ought to have been amended (to be more accurate, it ought to have been more carefully drafted), but the failure to amend was unquestionably harmless. *Cf. Commonwealth v. Day,* Ky., 599 S.W.2d 166 (1980). The defendant was fully aware of the nature and cause of the charge, and was not in the least surprised, misled or otherwise unfairly prejudiced by the variance.

## II.

■ We next consider whether the trial court committed reversible error in overruling the defendant's objection to hearsay testimony by A. We begin by noting the unusual nature of this case. According to her own testimony, the alleged victim of the sexual crimes was not an eyewitness to the charged acts. Yet she was permitted to testify as to what her friend had told her (the friend herself having mostly second-hand information), and as to gossip she had heard at school. Such testimony, if offered in proof of any element of the charged offense, was patent hearsay. - The hearsay was incompetent to prove that the criminal acts had occurred or that the defendant had committed them.

It was moreover not relevant, independent of its truth, to prove that any such acts were committed without the victim's consent.

■ A. was certainly competent to testify as to her own relevant observations, actions and the like. She could of course testify that she had not consented, or at least that she did not recall consenting, to any sexual contact. If necessary to explain why she had sought medical attention or talked to authorities, she might permissibly have testified briefly that she had heard reports that she had been abused at the party. In that event, and upon proper motion, the jury should have been admonished that the fact that she had heard such reports was admissible to explain her actions, but was not to be considered as evidence that the reports were true, or that the acts had occurred. Repeated references to such reports, particularly references to the defendant by name, served no legitimate evidentiary purpose, and ought not to have been admitted over objection.

## III.

■ For the same reasons, much of Dana Hardy's testimony was inadmissible hearsay. If the hearsay as to the alleged sexual acts could not be admitted through A., it could not become admissible through Hardy simply because A. had repeated it to her.

The trial court ruled Hardy's testimony admissible under the decision in *Drumm v. Commonwealth,* Ky., 783 S.W.2d 380 (1990). But the issue here is quite different from the issue in *Drumm.* In that case, adopting Fed.R.Evid. 803(4), we held admissible, if more probative than unfairly prejudicial:

> "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

*Id.* at 384.

As we also observed in *Drumm:*

> The reasons for exceptions to the hearsay rule are grounded not just on need, but on guarantees of trustworthiness which are

the substantial equivalent of cross-examination.

*Id.* at 382–383.

Statements made to a physician, psychiatrist or psychologist are deemed reliable due to the context in which they are made; we reason that a person seeking such treatment is inclined to be truthful in his own best interest. But in the present case, the truthfulness of the ultimate content of A.'s statements to Hardy is not a matter of A.'s veracity, nor even the veracity of those from whom *she* had heard the reports, but the veracity of those persons, several steps removed, who purportedly had witnessed the events. Here the content of the statements, the ultimate allegation of sexual intercourse, was not lent trustworthiness by the psychologist-client relationship. We did not hold in *Drumm*, and will not hold today, that a statement which would be inadmissible hearsay if offered by the declarant as a competent, testifying witness is rendered trustworthy in content, and admissible, for having been repeated to a psychologist.

■ By the same token, irrelevant information relayed to a psychologist does not become relevant by virtue of the communication. As we noted in *Drumm:*

[T]he trial court must also decide, in addition to the hearsay question, the relevancy question. This means only the statements that would qualify as relevant to an issue in the case if the declarant were testifying as a witness at the trial are admissible in any event.

*Id.* at 385.

None of Hardy's testimony bears any relevance as to whether the sexual acts in fact occurred. Given the unusual circumstances in this case, the most that can be said is that the testimony permits an inference that A. *believed* that they had occurred, and *believed* that she had not consented. These beliefs had no foundation in her own direct perception or recollection, but derived only from what others had told her. Hardy's testimony regarding the emotional impact of the purported crimes upon A. was of minimal or no relevance to any issue being tried, and was unfairly prejudicial to the defendant.

■ The Court of Appeals, while recognizing that errors occurred in the admission of testimony by A. and by Hardy, concluded that the errors were harmless. Considering the amount of accumulated hearsay and irrelevant evidence, we are unable to say that these errors did not significantly and adversely affect the defendant's substantial rights with respect to trial of the charges of sexual crimes.

### IV.

■ We turn next to the contention that the prosecution of Johnson as an adult, while the other alleged offenders were either treated in juvenile court (S.S.) or not proceeded against at all (C.G., K.B.), constitutes selective enforcement, requiring that the convictions be reversed and that the matter be remanded to juvenile court. Johnson's only cited authority for this proposition is the decision in *City of Ashland v. Heck's, Inc.,* Ky., 407 S.W.2d 421 (1966). That decision upheld an injunction barring the city from enforcing the Sunday closing law against Heck's while not prosecuting any other violator. From the record it was

reasonably clear that if relief is denied in this action the employees of Heck's will be forced to comply with the law and all of the others in question will be treated as exempt.

*Id.* at 423.

The Court went on:

It is only the obvious and flagrant case that warrants relief, and unquestionably this instance, in which appellees are the only persons found guilty in Ashland in a quarter century, falls in that category.

*Id.* at 424.

For two reasons, we are unpersuaded by Johnson's argument. First, even assuming that all the putative offenders and offenses were identical in this case, the situation would still not be analogous to that in *City of Ashland v. Heck's.* Johnson has certainly not established that he is the only person in a quarter century to be prosecuted for rape, sodomy, and sexual abuse in the Commonwealth, or even in Graves County; nor has he demonstrated that he is the only juvenile

among many accused of such crimes to be tried as an adult. The mere fact that *some* other putative offenders are not prosecuted does not make a case of selective or arbitrary enforcement. Secondly, the putative offenders and offenses in this case are *not* in fact identical. The boys differed in age and, presumably, maturity. (S.S. was fourteen, C.G. was fifteen, and K.B., like Johnson, was seventeen.) More importantly, in contrast to the evidence against the other boys, there was substantial evidence implicating Johnson in at least three sexual offenses (including two Class B felonies) and a wanton endangerment offense.

▮ In passing, we note with approval the trial court's comment that Johnson's refusal to plead guilty in juvenile court is *not* a legitimate reason for trying him as an adult.

We conclude that Johnson has not demonstrated an obvious and flagrant case of selective enforcement, and that the trial court did not abuse its discretion in declining to remand the matter to the juvenile court.

### V.

▮ Johnson contends that the trial court committed reversible error by not declaring a mistrial due to certain remarks made by the prosecutor in closing argument. We begin by observing that the record reveals no motion for a mistrial in regard to these incidents.

One part of the argument which the defense found objectionable was the following:

> If you believe the Commonwealth's case and for reasons best known to you such as sympathy, pity or whatever and you decide to find him not guilty, you send the wrong message to our community.

The objection was that the jury must believe the Commonwealth's case beyond a reasonable doubt, not simply "believe the Commonwealth's case." The Court allowed the comment, but admonished the jury that the Commonwealth's burden was to prove its case beyond a reasonable doubt. We are unable to apprehend in this incident any substantial prejudice to the defendant with respect to the standard of proof. Johnson argues on review that the comment regarding the

"wrong message to the community" was improper, inflammatory, and prejudicial. This argument was not made below, does not demonstrate palpable error resulting in manifest injustice, and consequently will not be reviewed.

At another point, the prosecutor argued:

> But I will tell you one thing: [A.] won't forget this day, nor will Ted Johnson. This is not just Ted Johnson's day in Court. This is [A.'s] day in Court. The outcome of this case is equally important to both the accused and the ...

Objection was raised on grounds of "unfair inference," and was overruled. The prosecutor did not, however, continue the line of argument. It was as if the objection had been sustained, without an admonition to disregard. We do not believe that this truncated argument was so inflammatory or prejudicial as to require reversal.

### VI.

▮ Finally, Johnson contends that the trial court committed reversible error by failing to instruct the jury on the lesser-included offenses of sexual misconduct and sexual abuse in the third degree, and as to misdemeanor penalties.

Our inquiry into this complex issue begins with a review of the relevant statutes:

> [KRS] 510.040. **Rape in the First Degree.**—(1) A person is guilty of rape in the first degree when:
>
> (a) He engages in sexual intercourse with another person by forcible compulsion; or
>
> (b) He engages in sexual intercourse with another person who is incapable of consent because he:
>
> 1. Is physically helpless; or
>
> 2. Is less than twelve (12) years old.
>
> (2) Rape in the first degree is a Class B felony unless the victim is under twelve (12) years old or receives a serious physical injury in which case it is Class A felony.
>
> 510.070. **Sodomy in the First Degree.**—(1) A person is guilty of sodomy in the first degree when:

(a) He engages in deviate sexual intercourse with another person by forcible compulsion; or

(b) He engages in deviate sexual intercourse with another person who is incapable of consent because he:

1. Is physically helpless; or

2. Is less than twelve (12) years old.

(2) Sodomy in the first degree is a Class B felony unless the victim is under twelve (12) years old or receives a serious physical injury in which case it is a Class A felony.

**510.110. Sexual Abuse in the First Degree.**—(1) A person is guilty of sexual abuse in the first degree when:

(a) He subjects another person to sexual contact by forcible compulsion; or

(b) He subjects another person to sexual contact who is incapable of consent because he:

1. Is physically helpless; or

2. Is less than twelve (12) years old.

(2) Sexual abuse in the first degree is a Class D felony.

**510.130. Sexual Abuse in the Third Degree.**—(1) A person is guilty of sexual abuse in the third degree when:

(a) He subjects another person to sexual contact without the latter's consent.

(b) In any prosecution under this section, it is a defense that:

1. The other person's lack of consent was due solely to incapacity to consent by reason of being less than sixteen (16) years old; and

2. The other person was at least fourteen (14) years old; and

3. The actor was less than five (5) years older than the other person.

(2) Sexual abuse in the third degree is a Class B misdemeanor.

**510.140. Sexual Misconduct.**—(1) A person is guilty of sexual misconduct when he engages in sexual intercourse or deviate sexual intercourse with another person without the latter's consent.

(2) Sexual misconduct is a Class C misdemeanor.

**510.020. Lack of Consent.**—(1) Whether or not specifically stated, it is an element of every offense defined in this chapter that the sexual act was committed without consent of the victim.

(2) Lack of consent results from:

(a) Forcible compulsion;

(b) Incapacity to consent; or

(c) If the offense charged is sexual abuse, any circumstances in addition to forcible compulsion or incapacity to consent in which the victim does not expressly or impliedly acquiesce in the actor's conduct.

(3) A person is deemed incapable of consent when he is:

(a) Less than sixteen (16) years old;

(b) Mentally retarded or suffers from a mental illness;

(c) Mentally incapacitated; or

(d) Physically helpless.

**510.010. Definitions.**—The following definitions apply in this chapter unless the context otherwise requires:

(1) "Deviate sexual intercourse" means any act of sexual gratification involving the sex organs of one (1) person in the mouth or anus of another;

.    .    .    .    .

(6) "Physically helpless" means that a person is unconscious or for any other reason is physically unable to communicate unwillingness to an act;

(7) "Sexual contact" means any touching of the sexual or other intimate parts of a person done for the purpose of gratifying the sexual desire of either party; and

(8) "Sexual intercourse" means sexual intercourse in its ordinary sense. Sexual intercourse occurs upon any penetration, however slight; emission is not required.

Apart from definitions, the trial court's instructions in regard to the sexual offenses consisted of first-degree rape (sexual intercourse while A. was physically helpless); first-degree sodomy (deviate sexual intercourse while A. was physically helpless); and first-degree sexual abuse (sexual contact while A. was physically helpless).

■ In view of all the evidence, and considering the complexity of this case, we believe that these instructions were inadequate to inform the jury of the entire applicable law. We first observe (although the issue was not raised) that sexual abuse in the first degree is a lesser-included offense of both rape in the first degree and sodomy in the first degree, while at the same time it was in this case a primary charge of the indictment, relating to a separate instance of sexual contact (the insertion of the foreign objects and the touching of the breasts). The instruction, couched in general terms of "sexual contact" without differentiating the act from those acts constituting rape and sodomy, permitted the jury to find Johnson guilty twice for the same act, e.g., intercourse constituting rape and intercourse constituting sexual contact and, therefore, sexual abuse.

■ In addition to a clearer instruction on the primary charge of sexual abuse in the first degree, thorough instruction would also have included, we believe, separate lesser-included-offense instructions under the rape and sodomy charges. While there was sufficient evidence to convict Johnson of the higher offenses, the evidence as a whole demonstrates that the jury might reasonably have found Johnson not guilty of those offenses but guilty in each instance of sexual abuse in the first degree. With respect to rape, there was considerable evidence that Johnson had *attempted* intercourse, but had failed, being unable to attain erection. The conditions at the scene had not conduced to clear observation or recollection. Given the opportunity, the jury might reasonably have believed that the attempt resulted in sexual contact without penetration. Similarly, with respect to the sodomy charge (grounded upon the testimony that Johnson had put his face between the victim's legs), it is significant that the only witness to this incident testified that he had not observed actual oral-genital contact. Under these circumstances, the jury clearly could have entertained a reasonable doubt as to whether Johnson had touched the victim's sexual parts, but could have believed beyond reasonable doubt that he had touched "other intimate parts" of her body (e.g., her thighs), thus committing sexu-

al abuse rather than sodomy. KRS 510.070; 510.110; 510.010(1) and (7).

■ Johnson contends that he was entitled to an instruction on sexual abuse in the third degree with respect to each of the sexual charges, and an instruction on sexual misconduct with respect to the rape and sodomy charges. All of these offenses, greater and lesser, have in common the element of lack of consent. The distinguishing characteristic of the greater offenses is that, so far as material to this case, the lack of consent must result from the victim's being physically helpless. The core of the present issue is, then, whether on the total evidence the jury might reasonably have doubted that A. was physically helpless, but might have found her otherwise incapable of legal consent. The latter proposition cannot be doubted, it being uncontroverted fact that A. was less than sixteen years old. Because A. was fifteen at the time of the alleged offenses, and Johnson was seventeen, the giving of an instruction on sexual misconduct in this case would not have thwarted the long-standing rule that KRS 510.140 was intended to apply only in cases where the victim is fourteen or fifteen and the defendant less than twenty-one, or where the victim is twelve-to-fifteen and the defendant is less than eighteen years of age. *Cf. Cooper v. Commonwealth*, 550 S.W.2d 478 (1977). What remains of the question is whether the jury might reasonably have believed beyond a reasonable doubt that Johnson had engaged in sexual acts with A., but entertained reasonable doubt as to whether A. had in fact been physically helpless at the time. *Cf. Reed v. Commonwealth*, Ky., 738 S.W.2d 818 (1987).

This jury heard evidence that A. had consented to and actively participated in sexual activity with C.G. There was further evidence that she had been walking and talking at the party afterwards. One witness put this incident *after* the encounter with Johnson. Significantly, the jury also heard A. testify that she had no recollection of any of these events. Moreover, S.M. indicated a substantial possibility that A. had exaggerated her symptoms of intoxication. Most of the witnesses admitted to having been in various stages of intoxication, and allowed

that there had been very little light in the room at the time of their critical observations. These facts no doubt account, in part, for the numerous inconsistencies among their reports. Given this evidence, and considering the totality of the evidence, we conclude that the jury, given the opportunity, might reasonably have doubted that A. had been "physically helpless" in the sense of being unable to communicate, and found Johnson guilty of the lesser rather than the greater offenses. We hold that the trial court erred to the defendant's substantial prejudice in failing to instruct the jury on sexual abuse in the third degree in connection with each of the sexual charges, and, in addition, on sexual misconduct in relation to the charges of rape and sodomy, respectively.

■ A further difficulty with the instructions involves the charge of wanton endangerment in the first degree. The trial court instructed on the lesser-included misdemeanors of wanton endangerment in the second degree and menacing. The defendant urged, to no avail, that the misdemeanor instructions should provide that the jury must fix a sentence upon a guilty verdict, noting that bifurcation under KRS 532.055 does not apply to misdemeanor convictions. The jury found Johnson guilty of wanton endangerment in the second degree, a misdemeanor. Thereafter the jury was dismissed and the parties agreed that Johnson would be sentenced to the minimum terms on the felony convictions, and to twelve months on the misdemeanor conviction, all to run concurrently.

While we see no reason to reverse the conviction for wanton endangerment in the second degree, we are compelled to vacate the sentence. We do not address the question of whether Johnson was prejudiced by the absence of a simultaneous verdict and sentence. Rather, we observe that the trial court's decision to deny probation or alternative sentencing on the misdemeanor conviction was unquestionably premised upon the presence of the felony convictions, all of which are being reversed. Justice requires that the trial court reconsider the final sentencing alternatives in view of the circumstances as they evolve from further proceed-ings upon remand. Most significantly, the correct disposition of one tried as a youthful offender depends crucially upon whether there is a conviction for a Class B felony or higher crime. *See Canter v. Commonwealth*, Ky., 843 S.W.2d 330 (1992).

The conviction for wanton endangerment in the second degree is affirmed.

The remaining convictions are reversed.

All sentences are vacated.

This matter is remanded to the Graves Circuit Court for further proceedings consistent with this opinion.

STEPHENS, C.J., and LAMBERT and LEIBSON, JJ., concur.

REYNOLDS, J., files a separate dissenting opinion, in which SPAIN and WINTERSHEIMER, JJ., join.

REYNOLDS, Justice, dissenting.

Respectfully, I dissent. A New Year's Eve party comprised principally of juveniles disintegrated, in part, into a booze and sexual melee with one principal 15–year–old female victim. The multitude of onlookers, if not participants, supplied an abundance of testimony as to the series of occurrences, as related in the majority opinion.

Frankly, the record contains errors, but they are without prejudicial effect. The testimony of Dana Hardy, the clinical psychologist, may be fairly analyzed, in light of this entire record, as being harmless error. The victim and every individual who made out-of-court statements, were called and testified at trial. Each was subject to cross-examination. Hardy's testimony was, at most, cumulative and therefore harmless. RCr 9.24. Any rationale for excluding hearsay was lacking in this case since the purposes for exclusion were not present. *See* Lawson, *Kentucky Evidence Law Handbook*, 2d ed., § 8.0 (1984). In this case there is no need to condemn such an error; it is quite frankly a harmless one. *See Lovell v. Commonwealth*, Ky.App., 695 S.W.2d 429 (1985).

Plainly, the victim and her two friends were vigorously cross-examined and the jury had an opportunity to observe their demean-

or during their testimony. Shonda testified that on the morning of January 1, 1990, she told the victim that the victim had sexual intercourse with Gargus. In addition, Chris testified that he saw Johnson and another boy have intercourse with the victim the night of the New Year's Eve party. That part of the trial testimony of Hardy was cumulative of the witnesses other than the victim and consequently even if Hardy's testimony was hearsay, any error was harmless. RCr 9.24. *Cf. Summitt v. Commonwealth,* Ky., 550 S.W.2d 548 (1977).

Also, I respectfully part company with the majority and would find the testimony of the victim to be harmless. Upon direct examination the prosecutor inquired of the victim when she learned about the appellant's sexual assault. The response was that she had heard from her friend, Shonda. This, in part, was derived from second-hand information, but the acute basis for admission of this testimony is that it was not offered either for the truth of the matter asserted—that is, rape committed by the appellant—but to demonstrate how and when this victim became aware of the sexual assault and the reason for her following action of telling both her mother and the police. *Sanborn v. Commonwealth,* Ky., 754 S.W.2d 534, 541 (1988); *Preston v. Commonwealth,* Ky., 406 S.W.2d 398, 401 (1966).

This harmless error is rendered more harmless as the victim, the friend Shonda, and each individual who witnessed the offenses were present for trial and testified. *Hellstrom v. Commonwealth,* Ky., 825 S.W.2d 612, 617 (1992). It is suggested that a level playing field approach would disclose that there is not a substantial possibility that the result would have been different if the evidence had been excluded. RCr 9.24; *Abernathy v. Commonwealth,* Ky., 439 S.W.2d 949 (1969).

It was not reversible error to deny defendant's request to instruct the jury on the offenses of sexual misconduct and third-degree sexual abuse. A jury is to be instructed according to the evidence. *Commonwealth v. Sanders,* Ky., 685 S.W.2d 557 (1985). There is no absolute requirement for an instruction on a lesser included offense in ev-

ery instance. There is no requirement if the evidence clearly points to only one conclusion, and that being that the accused may only be guilty of one offense. *Payne v. Commonwealth,* Ky., 656 S.W.2d 719 (1983).

*Reed v. Commonwealth,* Ky., 738 S.W.2d 818 (1987) does not support the giving of a lesser included offense instruction under any stretch of the imagination applicable to the facts of this case. Johnson had denied the acts and, therefore, an instruction on sexual misconduct was not appropriate. One should not be unaware that the prosecutor charged Johnson with engaging in sexual intercourse with the victim, who was incapable of consent because she was physically helpless—not because of her age. The evidence presented related to the victim's incapacity to consent to sexual acts as being due to physical helplessness rather than to age. Denial of the requested instruction which was not supported by the evidence, did not constitute error. *Commonwealth v. Sanders,* 685 S.W.2d 557.

The error in regard to a misdemeanor instruction on second-degree wanton endangerment and menacing was harmless. Although appellant was found guilty of second-degree wanton endangerment misdemeanor, the imposition of sentence was, by the agreement of all parties, to run concurrent with the felony sentence. The error was by agreement and law rendered harmless.

I would affirm the judgment of conviction.

SPAIN and WINTERSHEIMER, JJ., join in this dissent.