Kyle SHEETS, Appellant

v.

COMMONWEALTH of Kentucky, Appellee

2014-SC-000002-MR

Supreme Court of Kentucky.

RENDERED: AUGUST 25, 2016

COUNSEL FOR APPELLANT: John Gerhart Landon, Assistant Public Advocate

COUNSEL FOR APPELLEE: Andy Beshear, Attorney General, David Bryan Abner, Assistant Attorney General

OPINION OF THE COURT BY JUSTICE WRIGHT

Appellant, Kyle Sheets, was convicted of first-degree sexual abuse and two counts of first-degree sodomy. In a separate trial with a separate jury, he was convicted of possession of a handgun by a convicted felon. He was sentenced in accordance with the juries' recommendations to ten years' imprisonment for the sexual-abuse conviction, forty years' for each sodomy conviction, and six years' for the handgun conviction, all to run consecutively, subject to the statutory maximum aggregate sentence of seventy years. Sheets now appeals as a matter of right, Ky. Const. § 110(2)(b), and raises the following allegations of error: (1) the trial court erred when it failed to grant his motions for directed verdicts of acquittal; (2) the trial court violated his right to be free from double jeopardy; (3) the trial court violated his right to a unanimous verdict; (4) the Commonwealth erred when it introduced irrelevant evidence of legal sexual acts between Sheets and his wife; (5) the Commonwealth erred when it alleged Sheets's defense attorney acted immorally or illegally by investigating the allegations; (6) one of the Commonwealth's witnesses gave improper testimony on cross examination; (7) the trial court erred by failing to conduct an *in camera* review of Sheets's alleged victim's psychological counseling records; and (8) the trial court erred when it included an instruction on a definition of "constructive possession" on his possession-of-a-handgun-by-a-convicted-felon charge. This Court does not have jurisdiction to review the possession-of-a-handgun-by-a-convicted-felon conviction and sentence on direct appeal because the sentence for that conviction is less than twenty years' imprisonment. Thus, we will not address Sheets's final claim of error. We dismiss Sheets's claim concerning his possession-of-a-handgun-by-a-convicted-felon conviction and remand it to the Court of Appeals, where jurisdiction properly lies. We will address each of his other alleged errors in turn.

## I. BACKGROUND

Kyle Sheets lived with his wife, Rhonda, and her two minor children, Michelle and Adam,[1] in a small, two-story residence in Elsmere, Kentucky.

In August 2012, then-nine-year-old Michelle told a friend that Sheets had previously made her "suck his dick." Adam, thirteen years old at the time, overheard this and told their mother. Rhonda immediately confronted Sheets about the allegations, which he denied. The next day, Rhonda took Michelle for a drive to talk privately. According to Rhonda, Michelle changed her story during the drive.[2] Ultimately, Rhonda disbelieved Michelle's assertions and took no further action at that time.

Several months later, the Department of Community Based Services (DCBS) began an investigation into the allegations.[3] Sheets agreed to move out of the residence while the allegations against him were investigated, and the Elsmere Police Department was contacted. Michelle was referred to the Northern Kentucky Children's Advocacy Center (CAC) in December 2012. A forensic interview was conducted during

---

1. Consistent with this Court's present practice, "Michelle" and "Adam" are pseudonyms used to identify the minor children.

2. The trial court sustained the Commonwealth's objection to the introduction of testimony by Rhonda about what Michelle changed her story to. The exclusion of that testimony is not an issue on appeal.

3. It is unclear how Michelle's allegations were brought to the attention of DCBS.

which Michelle reported a history of sexual contact with Sheets, including penile-vaginal, penile-anal, oral-vaginal contact, and contact with sex objects. The CAC's medical director, Dr. Berkeley Bennett,[4] then conducted a full physical examination, which was normal and revealed no physical evidence of abuse. At trial, Dr. Bennett testified that the lack of physical findings of abuse was not particularly relevant because children heal quickly and that, as a result, it is quite common for child sexual abuse victims not to have any physical symptoms of such abuse when examined.

Because of the history Michelle provided during her forensic interview with CAC staff, Dr. Bennett also ordered testing for sexually-transmitted diseases. Michelle tested positive for gonorrhea. As a result, police obtained a search warrant to test Sheets for gonorrhea, and the results of that test were negative. Rhonda also tested negative for gonorrhea.

Because of Michelle's positive gonorrhea test, Dr. Bennett had her undergo a follow-up test and treatment at a hospital one month later. The results of the follow-up test were negative. Dr. Bennett testified that the disparity in the two tests could have several explanations: that the follow-up sample obtained by the hospital may have differed from the first sample obtained by the CAC due to potential failures by the hospital to follow rigorous protocols in administering the test; that the infection may have spontaneously resolved in between the two tests, which is not uncommon with young children; or that the first test was a false positive, which Dr. Bennett thought unlikely. In the end, Dr. Bennett estimated an eighty to ninety percent likelihood that Michelle actually had been infected with gonorrhea when she was tested by the CAC.

Also as a result of Michelle's allegations, police obtained a warrant to search the Sheetses' residence. There, in a drawer in the Sheetses' bedroom, they found several sex objects and lubricants, pornographic movies, and a digital camera with a memory card containing four homemade pornographic videos of Rhonda and Sheets. Police also discovered a handgun in the Sheetses' bedroom closet.

Sheets was charged with incest, two counts of first-degree sodomy, first-degree rape, first-degree sexual abuse, distributing obscene matter to a minor, being a second-degree persistent felony offender (PFO), and possession of a handgun by a convicted felon. At trial, the Commonwealth moved for and was granted dismissal of the first-degree rape, incest, and second-degree PFO charges. The trial court also granted Sheets's motion for a directed verdict on the charge of distributing obscene matter to a minor. The handgun charge was severed and tried separately from the other charges.

In the trial of the sex-related offenses, the Commonwealth's case against Sheets primarily consisted of Michelle's testimony. At trial, she testified that Sheets had made her put his "pickle" (her term for penis) in her mouth, that he would direct her to give him "fifty" (meaning fifty "sucks"), and that this had often happened when she asked him for something, such as money. She also testified that he had licked her "ketchup" (her term for vagina) and had touched it with a silver vibrator, which police found in the bedroom drawer. She stated that sometimes he would make her watch videos depicting him and her mother engaging in sexual activities, although she later testified that she had seen only one video, which she accurately described as showing her mother using a

---

4. Dr. Bennett is board-certified in child-abuse pediatrics.

large, tan dildo (another object police found in the drawer).

Other than Michelle's testimony, the Commonwealth also introduced testimony from Rhonda that Michelle had always had problems wetting the bed, but that her bedwetting had stopped when Sheets moved out of the house only to resume a couple weeks before trial. The Commonwealth also introduced the testimony of Dr. Bennett, as recounted above.

The defense theory was that the allegations were untrue and that Michelle, who had often had opportunities for unsupervised access to her mother and Sheets's bedroom, had fabricated them based on knowledge of the sex toys and videos that she had obtained on her own. Her brother testified that she had a reputation for not telling the truth, and her mother testified that she commonly told small lies, typically to deflect blame from herself in the face of some minor alleged wrongdoing (by, for example, claiming she had not eaten candy that had gone missing, when the empty wrapper was later found in her bedroom). The defense also attempted to show that any opportunities Sheets may have had to be alone with Michelle during the four-year period covered by the indictment (2009 to 2012) would have been seldom and brief.

In the end, the jury found Sheets guilty of the remaining count of first-degree sexual abuse and two counts of first-degree sodomy. They recommended sentences of forty years' imprisonment for each sodomy conviction and ten years' imprisonment for the sexual-abuse conviction, all to run consecutively for a total of ninety years' imprisonment. The trial court imposed a total maximum aggregate sentence under KRS 532.110(1)(c) of seventy years' imprisonment. In a separate trial, Sheets was also convicted of possession of a handgun by a convicted felon, for which he was sen-tenced to six years' imprisonment to run consecutively to the other sentences, subject to the maximum aggregate sentence under the statute.

Sheets now appeals as a matter of right. *See* Ky. Const. § 110(2)(b). Additional facts will be developed as needed in the discussion below.

## II. ANALYSIS

### A. Sheets was not entitled to directed verdicts of acquittal.

■ Sheets argues that the trial court erred in failing to grant directed verdicts on the sexual-abuse and sodomy charges. The focus of Sheets's argument is that Michelle's testimony was "uncorroborated and inherently improbable" and thus insufficient to support his convictions.

■ When deciding a motion for directed verdict, a trial court "must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky.1991). The court must "assume that the evidence for the Commonwealth is true, but reserve[e] to the jury questions as to the credibility and weight to be given such testimony." *Id.* The court should not grant a directed verdict "[i]f the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty." *Id.* Only if a reviewing court determines "under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt," will a defendant be entitled to a directed verdict of acquittal on appeal. *Id.* After viewing the evidence as a whole, this Court concludes that Sheets is not entitled to directed verdicts on the sodomy and sexual-abuse charges.

As noted above, the Commonwealth's case was based almost solely on Michelle's testimony alleging that Sheets had touched

her vagina with a silver vibrator found in Sheets's bedroom, had licked her vagina, and had made her put his penis in her mouth. Michelle further testified that he had shown her at least one video of her mother engaging in sexual activities with another sex toy found in the Sheetses' bedroom, and a video matching that description was also found in the couple's bedroom. Rhonda also testified that Michelle's bedwetting had stopped when Sheets moved out of the residence but had resumed leading up to the trial, allowing for the reasonable inference that her bedwetting was at least in part caused by distress stemming from Sheets's alleged abuse. Taking all of this evidence as true and drawing all reasonable inferences in favor of the Commonwealth, it is clear that the evidence was sufficient to allow a reasonable juror to find Sheets guilty beyond a reasonable doubt.

Sheets contends, however, that because Michelle's testimony was "strange" and "inherently improbable," and in light of her positive STD test results (while Sheets's and Rhonda's tests were negative), her testimony failed to reach a level of credibility necessary to satisfy the Commonwealth's beyond-a-reasonable-doubt burden standing alone. Thus, Sheets argues corroborating evidence was required to sustain his convictions.

For support, Sheets cites this Court's holding in *Garrett v. Commonwealth* that "[c]orroboration in a child sexual abuse case is required only if the unsupported testimony of the victim is 'contradictory, or incredible, or inherently improbable.'" 48 S.W.3d 6, 10 (Ky.2001) (quoting *Robinson v. Commonwealth*, 459 S.W.2d 147, 150 (Ky.1970)). But, this is not such a case. Other than a few fairly minor discrepancies, which "are matters of credibility going to the weight to be given by the jury to the child's testimony," *id.* there is nothing

about Michelle's testimony that was truly contradictory, incredible, or improbable. And, further still, Sheets's argument and reliance on *Garrett* presupposes that there was no corroborating evidence whatsoever, which is incorrect. To be sure, the fact that Michelle's bedwetting ceased when Sheets left the residence, but resumed in the lead up to trial corroborated Michelle's testimony despite the absence of any physical evidence of abuse or witnesses to the abuse. The same can be said for the fact that one of the pornographic home-video recordings found in the Sheetses' bedroom matched Michelle's testimonial description.

Sheets's claim is best supported by the gonorrhea-testing evidence, which suggests that while Michelle may have been abused, it may have been at someone else's hands. But the gonorrhea-testing evidence was not conclusive, as Dr. Bennett testified, and it does not render Michelle's account of what happened impossible. While the evidence may possibly be probative of Sheets's innocence, it was not conclusive proof, and certainly would not bar a reasonable jury from finding guilt. Dr. Bennett testified that gonorrhea is often asymptomatic in men and that the disease is easily treated with a single dose of antibiotics. Therefore, a reasonable juror could have believed from the evidence that Michelle's first positive gonorrhea test was correct, but, by the time of Sheets's test weeks—or possibly even months—after his last alleged contact with Michelle, he could have had intervening treatment (even a single shot of antibiotics for an unrelated condition) and been cured.

Because it was not clearly unreasonable for the jury to find Sheets guilty on the sexual-abuse and sodomy convictions, he was not entitled to directed verdicts of acquittal.

**B. Double Jeopardy**

Sheets next argues that his right to be free from double jeopardy under § 13 of the Kentucky Constitution and the Fifth and Fourteenth Amendment to the United States Constitution was violated when the jury was instructed on both sexual abuse and sodomy without proper differentiation. The Commonwealth concedes that first-degree sexual abuse is a lesser-included offense of sodomy. *Johnson v. Commonwealth*, 864 S.W.2d 266, 277 (Ky. 1993).

In *Johnson*, we pointed out that "[t]he instruction, couched in general terms of 'sexual contact' without differentiating the act from those acts constituting rape and sodomy, permitted the jury to find Johnson guilty twice for the same act, e.g., intercourse constituting rape and intercourse constituting sexual contact and, therefore, sexual abuse." *Id.* Sheets argues that the same is true in his case. The Commonwealth disagrees with Sheets's assertion that the trial court failed to adequately differentiate between the offenses in its instructions to the jury.

Sheets was charged with first-degree sexual abuse and two counts of sodomy—one for allegedly performing oral sex on Michelle and the other for having Michelle perform oral sex on him. The jury instruction for first-degree sexual abuse read:

You will find the Defendant guilty of First-Degree Sexual abuse under this Instruction and Count V of the Indictment, if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in this county on or about 2009 to 2012 and before the finding of the Indictment herein, the Defendant subjected [Michelle] to sexual contact; AND

B. That at the time of such contact, [Michelle] was less than 12 years of age.

Sheets argues that this instruction allowed the jury to find him guilty of sexual abuse for the same conduct for which it found him guilty of sodomy. In fact, he argues that under the instructions, if the jury found him guilty of either count of sodomy, it necessarily had to find him guilty of sexual abuse. The Commonwealth agrees that the language of the written instruction itself does not properly differentiate the crimes. However, the Commonwealth insists the trial court corrected this error in its oral instruction to the jury.

Specifically, after reading the first seven instructions to the jury, the trial court stated:

[s]ee you've got three separate substantive crimes presented to you. The first count of sodomy deals with the allegation that the defendant had oral contact with [Michelle's] vagina. The second count of first degree sodomy deals with the allegation that [Michelle] had oral contact with the defendant's penis. And the third count of [sexual abuse in the first degree] deals with the allegations surrounding the silver vibrator having contact with [Michelle's] vagina. So three separate and distinct substantive crimes and those are followed with three separate and distinct verdict forms.

Our Criminal Rules address jury instructions in RCr 9.54, which provides:

(1) It shall be the duty of the court to instruct the jury in writing on the law of the case, which instructions shall be read to the jury prior to the closing summations of counsel. These requirements may not be waived except by agreement of both the defense and the prosecution.

(2) No party may assign as error the giving or the failure to give an instruction unless the party's position has been fairly and adequately presented to the

trial judge by an offered instruction or by motion, or unless the party makes objection before the court instructs the jury, stating specifically the matter to which the party objects and the ground or grounds of the objection. . . .

In support of his position, Sheets points out that this Court has held that counsel's remarks during closing argument were not sufficient to cure defective jury instructions. *Harp v. Commonwealth*, 266 S.W.3d 813, 820–21 (Ky.2008). However, that is not what happened in the case at bar. Here, the trial court itself, when reading the instructions to the jury as required under RCr 9.54, differentiated the crimes.

▇▇▇ Because Appellant did not object to the jury instructions, this matter is not preserved and we will review it only for palpable error under RCr 10.26. "Palpable error affects the substantial rights of the party and results in manifest injustice. Furthermore, an appellant claiming palpable error must show that the error was more likely than ordinary error to have affected the jury." *Boyd v. Commonwealth*, 439 S.W.3d 126, 129–30 (Ky.2014). "In determining whether an error is palpable, 'an appellate court must consider whether on the whole case there is a substantial possibility that the result would have been any different.'" *Commonwealth v. Pace*, 82 S.W.3d 894, 895 (Ky.2002) (citing *Commonwealth v. McIntosh*, 646 S.W.2d 43, 45 (Ky.1983)).

Therefore, we are tasked with determining not whether the trial court erred in its instructions to the jury, but whether there is a substantial possibility that the outcome of the case would have been different without that error. While it would have been preferable for the written instructions to have differentiated between the crimes, we hold that any error in this regard does not amount to palpable error since the trial court made the differentiation orally while instructing the jury. There is no substantial possibility the result would have been different in the absence of the error.

### C. Unanimous Verdict

▇▇▇ Sheets next asserts that the trial court violated his right to a unanimous verdict, guaranteed by § 7 of the Kentucky Constitution, by giving a single instruction for multiple alleged acts of abuse in each of his two sodomy convictions. The two counts of sodomy involved different acts—the first related to Michelle's mouth contacting Sheets's penis, and the second concerned Sheets's mouth contacting Michelle's vagina. The Commonwealth concedes that the jury instructions regarding the sodomy charge involving Michelle's mouth contacting Sheets's penis constitute reversible error; however, the Commonwealth disputes that the trial court erred in its instructions regarding the remaining sodomy charge.

This Court stated in *Johnson v. Commonwealth*, 405 S.W.3d 439, 449 (Ky.2013), that a defendant's right to a unanimous verdict is violated by "a general jury verdict based on an instruction including two or more separate instances of a criminal offense, whether explicitly stated in the instruction or based on the proof." Here, the instructions for Sheets's two counts of sodomy did not provide any specifics about the events surrounding the charged conduct. Rather, they merely provided a four-year time span during which the events could have taken place.

Michelle testified about multiple times that Sheets made her perform oral sex on him. These separate acts occurred in various locations in the home over a period of years. The jury instructions did not direct the jury to one such instance, nor did the jury otherwise specify on the verdict form that it unanimously based its ruling on a

particular instance of abuse. This specifically runs afoul of our precedent in *Johnson*. Therefore, we reverse Sheets's conviction for sodomy based upon Michelle's oral contact with his penis.[5]

■ Sheets argues that the same problem exists as to the second sodomy conviction in which he was charged with engaging in deviate sexual intercourse with Michelle by having oral contact with her vagina. We disagree. While the jury instructions on this count also failed to state a specific date or otherwise identify a particular instance of abuse, Michelle only testified as to one instance of Sheets orally contacting her vagina. Therefore, the proof simply does not support a unanimity problem with this instruction. Though all the parties, as evinced by Sheets's trial counsel's closing arguments, treated this testimony as denoting one single act of abuse, Sheets now complains that the testimony was ambiguous and could have referred to more than one instance of abuse.

As to this count, the Commonwealth presented the following evidence through Michelle's direct examination:

Commonwealth: [Michelle], did [Sheets] ever do bad things to you?

Michelle: Yes.

Commonwealth: Can you tell me what they were?

Michelle: He licked my ketchup, and that's it.

Commonwealth: He licked your ketchup? Ok. Tell me about that. Where were you when that happened?

Michelle: In his room.

Commonwealth: Okay. When you say he licked your ketchup, do you mean he licked your vagina?

Michelle: Yes.

Unlike the other instances of sodomy involving Sheets forcing Michelle to perform oral sex on him, the Commonwealth only presented this limited evidence to support this count of sodomy. Just as the trial court and parties treated this incident during trial, we also believe Michelle's testimony relates to a single occurrence. Because Sheets was not convicted "based on an instruction including two or more separate instances of a criminal offense, whether explicitly stated in the instruction or based on the proof," *Johnson*, 405 S.W.3d at 449, there is no violation of his right to a unanimous verdict as to this count of sodomy. Therefore, we affirm the trial court as to Sheets's sodomy conviction involving him making oral contact with Michelle's vagina, but reverse Sheets's conviction for sodomizing Michelle on the count involving Michelle's mouth contacting Sheets's penis and remand that matter to the trial court for further proceedings consistent with this opinion.

### D. Testimony about Sheets and Rhonda's Sexual Activities

■ During its direct examination of Rhonda, the Commonwealth elicited testimony about Rhonda's and Sheets's sexual

---

5. We note that, as of April 9, 2016, when the Governor signed Senate Bill No. 60 into law on an emergency basis, a new cause of action exists under which "a person may be charged with committing an offense against a vulnerable victim in a continuing course of conduct." When a defendant is charged under this newly-created offense, the jury need only "unanimously agree that two (2) or more acts in violation of the same statute occurred during the specified period of time. The jury need not agree on which specific acts occurred." This new law is not at issue in this case, but we mention it as the Commonwealth may choose to charge future defendants accused of such crimes under this law and avoid the unanimity issues present in the case at bar.

activities. Sheets argues that this testimony was irrelevant and, furthermore, that it constituted character evidence which should have been barred as evidence of bad conduct introduced for no purpose other than to show his and his wife's sexual proclivities—that is, that they had a propensity for behaving sexually in ways that some might find unusual. Sheets admits that he did not object to the introduction of any of the complained-of testimony at trial, but asks us to review his allegations for palpable error. As explained below, this Court disagrees and holds that any error in this regard did not rise to the level of palpable error.

Sheets specifically complains about the Commonwealth's following line of questions:

Commonwealth: How often would you use [the dildos, lubricants, and pornographic films]?

Rhonda: Occasionally. I don't have a—I mean, I would get in the drawer if I wanted to use one, randomly.

. . .

Commonwealth: How often would you clean these items?

Rhonda: After I used them, I'd wash them off.

Commonwealth: You'd wash them off with soap. Um, there is one item I want you to take a look at, and it is in the top of what I have marked as Commonwealth's Exhibit 10. What did I just hand you a photo of?

Rhonda: A doctor's instrument from when you have a pap smear.

. . . .

Commonwealth: Now, I'm sorry, how did you obtain this?

Rhonda: They are disposable at the doctor's office.

Commonwealth: Disposable. Was this used on you?

Rhonda: Yes.

Commonwealth: So, you took this, I'm sorry, you took a disposable speculum?

Rhonda: Yes.

Commonwealth: And what would you do with this speculum?

Rhonda: To role play.

Commonwealth: To role play.

Rhonda: With my husband.

Commonwealth: And what do you mean by role play?

Rhonda: We'd play doctor.

Commonwealth: You'd play doctor?

Rhonda: Yes.

. . . .

Commonwealth: And would [Sheets] ever give your son pornography?

Rhonda: Not to my knowledge.

Commonwealth: Do you know if they ever talked about sex and girls?

Rhonda: Yes.

Commonwealth: Are you aware he gave your thirteen-year-old son condoms?

Rhonda: No.

Sheets contends that the questions concerning Rhonda's use and cleaning of sex toys were irrelevant. We disagree. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. Our Rules further provide that "[a]lthough relevant, evidence may be ex-

cluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." KRE 403.

As to the relevancy of the use and cleaning of the sex toys, we point out that Dr. Bennett testified that if the sex toys were used by others, they could have infectious material on them, thus increasing the risk of Michelle acquiring a sexually transmitted disease. In the case at bar, there is an issue as to whether Michelle contracted gonorrhea, as the results of one test indicated she had the disease, while a later test indicated she did not. Therefore, these questions posed to Rhonda were relevant and their probative value was not substantially outweighed by the danger of undue prejudice.

■ Sheets also argues that Rhonda's testimony concerning the speculum was irrelevant. We disagree with that contention as well, even though the Commonwealth concedes the issue. Michelle had knowledge of certain sex toys found in Rhonda and Sheets's bedroom, but not of others. One of Sheets's defenses was that Michelle had seen the sex toys on her own. Thus, the contents of the drawer and when the items were acquired were certainly relevant and any undue prejudice does not substantially outweigh the evidence's probative value.

We do agree with Sheets, however, that the testimony about how the couple used the speculum, and what Rhonda meant by "role playing," were irrelevant and should not have been admitted at trial. However, as noted, Sheets did not object to this evidence at trial. Any error in this regard was not palpable, as further explained below.

■ Sheets further posits that the Commonwealth's questions concerning Rhonda's son were irrelevant. However, in the course of this line of questioning, Rhonda denied any knowledge of Sheets giving her son pornography or condoms. Therefore, Sheets had no reason to object to these questions when Rhonda's responses were actually helpful to his defense, as they rebutted the Commonwealth's assertions. This could have merely been Sheets' trial strategy—and we should certainly not classify it as palpable error.

■ In addition to his relevancy arguments, Sheets also asserts that the evidence in question should have been excluded under KRE 404 which provides that, with enumerated exceptions, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." As detailed above, most of the complained-of evidence was not presented in order to show Sheets's character, but, was admissible for other reasons. To the extent the evidence was not admitted for another purpose, we will review only for palpable error.

As Sheets admits, he did not object to any of this evidence at trial. He requests that this Court review this unpreserved claim for palpable error. As such, reversal will be required only if we determine that the unpreserved error affected Sheets's substantial rights and resulted in manifest injustice. RCr 10.26. We hold that there is no "substantial possibility that the result would have been any different" in the absence of any of the alleged errors. *Pace*, 82 S.W.3d at 895. Therefore, any error in this regard was not palpable.

We also point out that the questions and answers were not confrontational; rather, it appeared as if the questions were asked for purposes of clarification rather than sensationalism. With the other evidence

adduced at trial, these brief comments were neither shocking nor jurisprudentially intolerable. Since jurors may form a negative impression from an attorney making too many objections, or jurors may feel that the attorney is trying to hide something from them, many attorneys prefer not to object unless questions would cause significant harm. The few questions that were irrelevant caused little if any harm to Appellant's defense. The failure to object could just be attributed to trial strategy. It would be improper for us to highjack what may have been defense counsel's trial strategy and classify it as palpable error.

### E. Immoral or Illegal Defense Investigation

 Sheets next alleges that the Commonwealth's questioning of Rhonda and some of the Commonwealth's comments during its closing argument suggested that defense counsel acted immorally or illegally in investigating the allegations. In the complained-of line of questions, the Commonwealth asked Rhonda about taking her children to Sheets's defense counsel's office. After a defense objection, the trial court allowed the Commonwealth some leeway, stating that Sheets's defense counsel had opened the door to questions concerning the removal of the children during cross examination.

▪ As we recognized in *Commonwealth v. Stone*, 291 S.W.3d 696, 701–02 (Ky.2009), "[g]enerally stated, 'opening the door' to otherwise inadmissible evidence is a form of waiver that happens when one party's use of inadmissible evidence justifies the opposing party's rebuttal of that evidence with equally inadmissible proof." As this Court has further explained, "when one party introduces improper evidence, such 'opens the door' for the other party to introduce improper evidence in rebuttal whose only claim to admission is that it explains or rebuts the prior inadmissible

evidence." *Metcalf v. Commonwealth*, 158 S.W.3d 740, 746 (Ky.2005) (citing *Norris v. Commonwealth*, 89 S.W.3d 411, 414 (Ky. 2002)).

Specifically, Appellant complains of the following exchange during redirect examination:

Commonwealth: Did you ever take your two children to meet with the defense about your daughter's allegations against the defendant?

Rhonda: Yes.

. . . .

Commonwealth: And at that point, your children were taken?

Rhonda: Yes.

Commonwealth: After writing letters, phone calls, participating with the defense?

Defense: Objection, your honor.

. . . .

Commonwealth: So you took young [Michelle] to speak with [defense counsel], is that correct?

Rhonda: She didn't speak with him.

Commonwealth: A member of his team?

Rhonda: Yes.

Commonwealth: And [Adam] also?

Rhonda: Yes.

Commonwealth: In preparation for trial, is that correct?

Rhonda: This was a while ago, yes.

Commonwealth: And, at that point, your children were taken away?

Rhonda: Yes.

Commonwealth: Did you worry your children would be taken away the first time when you found out

about these allegations?

Rhonda: No.

Commonwealth: That you did nothing about from August 2012 to December 2012, you didn't think there was a chance that maybe your children would be taken away from you then?

Rhonda: No.

Commonwealth: No? That it would take continued exposure with the defendant before they would finally step in?

Rhonda: I didn't think I'd ever get my kids taken away.

....

Commonwealth: Did you ever worry, in discussions with the defendant that you would be prosecuted as well?

Rhonda: No.

Commonwealth: Did you ever have discussions about cooperating with [defense counsel] in conversations with the defendant?

Rhonda: About being prosecuted?

Commonwealth: Do you feel like that you've been cooperative with the Commonwealth?

Rhonda: Yes.

Commonwealth: You do?

Rhonda: Yes.

Commonwealth: So, the 200 phone calls, taking your children to the defense, you believe that's cooperation?

Rhonda: No, that was wrong on my part.

Though Appellant does not specifically complain that the trial court erred in its ruling that defense counsel opened the door to this line of questioning, we will address it as such before delving into his actual argument. We review a trial court's evidentiary rulings for an abuse of discretion. *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky.2000). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999). After reviewing the video record, we do not believe the trial court abused its discretion in holding that Sheets's defense counsel opened the door to questions regarding the children being removed from Rhonda. Appellant's counsel asked Rhonda about the custody of her children and the Commonwealth sought to explain the circumstances under which the children were removed. *Metcalf*, 158 S.W.3d at 746. The trial court's ruling was not arbitrary, unreasonable, unfair, or unsupported by sound legal principles. Therefore, to the extent that the Commonwealth's redirect concerned the removal of the children, the trial court did not abuse its discretion in allowing the testimony.

Appellant's argument is that the Commonwealth's questions to Rhonda concerning the custody of her children and some of the Commonwealth's statements during its closing argument suggested that defense counsel acted immorally or illegally in investigating the allegations. During its closing argument, the Commonwealth stated that "no one is on [Michelle's] side" and that her own mother did not believe her. Sheets argues the Commonwealth's closing argument was "more unduly prejudicial than probative.... Injecting the idea that the [d]efense was somehow unethical or acted illegally ...." We dis-

agree. The Commonwealth's questions to Rhonda and statements during closing argument attempted to show Rhonda's bias toward Sheets—not to implicate Sheets's counsel in any unethical or illegal conduct. Aside from the fact that Appellant's defense counsel opened the door to this line of questioning, it also amounted to an attack on the Commonwealth's own witness's credibility after Rhonda contradicted Michelle's testimony during cross-examination. This was proper impeachment. *See* KRE 607.

As to the Commonwealth's statements during closing argument, Sheets acknowledges that the Commonwealth enjoyed considerable latitude in presenting its arguments to the jury. However, he claims "[i]n this case, there was no accusation or evidence that the [d]efense attempted to influence the testimony that would be offered." We do not believe that the Commonwealth implied such. Again, we think the Commonwealth's brief reference to Rhonda taking her children to Sheets's attorney's office was aimed at its assertion that Rhonda was biased against her daughter. The Commonwealth neither explicitly stated nor impliedly asserted that the defense had done anything illegal or immoral in this regard.

■ We also reject Appellant's contention that the admission of this evidence amounted to prosecutorial misconduct, and point out that in order to establish such a claim, Sheets "must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *Commonwealth v. Spaulding*, 991 S.W.2d 651, 654 (Ky.1999) (internal citations and quotations omitted). Sheets fails to make such a showing. Furthermore, "[d]espite a defendant's characterization, [i]ssues involving the admission of evidence or testimony, when ruled upon by the trial court, do not constitute prosecuto-

rial misconduct." *Noakes v. Commonwealth*, 354 S.W.3d 116, 122 (Ky.2011)(internal citations and quotations omitted).

### F. Dr. Bennett's Testimony

■ Sheets's next allegation of error centers around his defense counsel's cross-examination of Dr. Bennett. During cross-examination, Sheets's counsel asked Dr. Bennett a question and now asserts that her answer was not only unresponsive, but "careened into completely irrelevant, prejudicial[,] and disasterous testimony." The Commonwealth points out that, while the testimony may well have been prejudicial, it was in response to a question asked not by the Commonwealth, but rather, by defense counsel. Sheets admits this alleged error is unpreserved, but asks this Court to review for palpable error.

We have long held, "[o]ne who asks questions which call for an answer has waived any objection to the answer if it is responsive." *Estep v. Commonwealth*, 663 S.W.2d 213, 216 (Ky.1983). Appellant claims the last answer in the following exchange was not responsive:

Defense: So, other than the blood test, there's really no purpose at all to do an exam of someone?

Dr. Bennett: Not necessarily. If there is a medical issue that needs treatment. A lot of children of sex abuse don't believe their bodies are normal, so a part of the exam is reassuring the child that you're okay, you're normal. No one is ever going to look at you and know that anything has happened. And we, of course, look for evidence of abuse.

Defense: So, evidence of abuse is further confirmation that there was abuse, correct?

Dr. Bennett: It can be, but we most often don't have it, so that's certainly not necessary.

Defense: So, if there is no evidence of abuse that's further confirmation abuse has occurred?

Dr. Bennett: I don't quite understand your question.

Defense: Well, I don't quite understand the answer that you've given. Because what you said is that if there is no sign of anything at all of anything here, yet that confirms the allegations that there has been abuse?

Dr. Bennett: No, that's not the correct wording. I wouldn't say that confirms the allegations, but it certainly doesn't make me less concerned there was abuse. A normal physical exam does not in any way make me think that abuse has not occurred.

Defense: So, regardless of what the exam shows you are going to think abuse has occurred either way?

Dr. Bennett: It depends on the history. There are certain histories that make you really, really concerned that something has happened. The history that [Michelle] provided, the details she was able to provide was a very, very concerning history for abuse. We get different histories all the time, and I can say honestly there are some I say like "I don't know." But, that is not really my role. I do the exam, and I provide assurance and I test them if I need to. But, there are instance[s] where I feel like the histories are so concerning and it makes me not have any doubt abuse has occurred, regardless of the physical exam.

Sheets's allegation of error concerns the last question and answer. He alleges he asked Dr. Bennett a "yes or no" question, but that the answer was non-responsive. We disagree. Sheets allowed Dr. Bennett to provide this answer without ever objecting or cutting her off. Her answer did concern the question asked—whether she would believe abuse had occurred in spite of the results of her physical examination. It was, in fact, a restatement of a question Dr. Bennett had already attempted to answer. There is simply no error here.

### G. Michelle's Psychotherapy Records

██ Before trial, Sheets moved the court to compel discovery of records of Michelle's psychological or psychiatric treatment with the Children's Advocacy Center (CAC). Michelle's guardian ad litem objected to the request, arguing that Sheets was not entitled to outright discovery of the privileged records or to an *in camera* review of the records by the trial court as he had failed to make the threshold showing of a reasonable belief that the records contain exculpatory evidence as required under *Commonwealth v. Barroso*, 122 S.W.3d 554 (Ky.2003). Sheets filed a reply to the guardian ad litem's objections, characterizing his position as a "catch-22" and contending that "proof is in the pudding" that the records might contain either exculpatory evidence or evidence relevant to the issue of the alleged victim's competency. He also specified that the reason for the request was to see whether Michelle may have recanted or varied her allegations during therapy.

After holding a hearing, the trial court found that Sheets had made an insufficient preliminary showing of a reasonable belief that the records contain exculpatory or impeachment evidence, concluding that the request was merely an attempt to go fishing into confidential records in the hopes of discovering some sort of unspecified information which could prove beneficial to his defense. The judge concluded that the mere fact that Michelle was undergoing psychological therapy was not an adequate

basis, standing alone, to defeat the evidentiary privilege for such records and overruled Sheets's motion to compel their production accordingly. Sheets claims this was error.

■ The psychotherapy records at issue are covered by the psychotherapist-patient privilege provided in KRE 507. The general rule is that "[a] patient, or the patient's authorized representative, has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications, made for the purpose of diagnosis or treatment of the patient's mental condition." KRE 507(b). Subsection (c) lays out several narrow exceptions to the general rule of privilege not relevant here, and other than those exceptions, the psychotherapist-patient privilege is an "absolute" privilege and thus not subject to avoidance based on a need for the evidence. *Barroso*, 122 S.W.3d at 558; *cf.* KRE 506(d)(2) (providing interest-weighing, need-based exception to the "qualified" counselor-client privilege under KRE 506).[6]

But this Court has also recognized that the privilege must give way to a criminal defendant's right to obtain exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and right to confront the witnesses against him under the Fourth Amendment and Section Eleven of the Kentucky Constitution. This effectively makes for a qualified privilege in the criminal-litigation context. *Hodge v. Commonwealth*, 17 S.W.3d 824, 844 (Ky.2000); *see also Barroso*, 122 S.W.3d at 561 ("[W]e conclude that the Compulsory Process Clause affords a criminal defendant the right to obtain and present exculpatory evidence, including impeachment evidence, in the possession of a third party that would otherwise be subject to the psychotherapist-patient privilege.").

Thus, in *Barroso*, this Court created a process by which a defendant may obtain an *in camera* review of the records sought, conducted by the trial court alone, which protects both the defendant's constitutional right to a fair trial and the witness's interest in the confidentiality of the

---

**6.** The exact type of therapeutic services Michelle received from the CAC is not clear, nor are the identity and qualifications of the person or persons that provided her such services.

We note this because KRE 507's absolute privilege applies only to confidential communications made for the purpose of diagnosis or treatment by a "psychotherapist," which is defined as either a state-licensed or certified psychiatrist, KRE 507(a)(2)(A), or psychologist, KRE 507(a)(2)(B); a clinical social worker licensed by the Kentucky Board of Social Work, KRE 507(a)(2)(C); or a licensed registered nurse or advanced registered nurse who practices psychiatric or mental-health nursing, KRE 507(a)(2)(D). On the other hand, KRE 506's qualified counselor-client privilege governs confidential communications made for counseling purposes between a client and "counselor," which includes, among others, sexual-assault counselors engaged in rape crisis centers as defined in KRS Chapter 421,

KRE 506(a)(1)(B); licensed professional clinical counselors and their associates as defined in KRS 335.500, KRE 506(a)(1)(E); and victim advocates as defined in KRS 421.570, KRE 506(a)(1)(G). If the requested records actually pertained to counseling services captured under KRE 506, rather than psychotherapist services, then the judge should have decided whether to compel production of the CAC records here under KRE 506(d)(2), which removes the privilege in any situation in which a trial court concludes that a need for the evidence outweighs the interests protected by the privilege.

While the record does not make clear exactly which type of services were being rendered by the CAC, and thus which privilege should apply, Sheets has never raised this issue. We therefore assume in our analysis that the trial court was correct in subjecting the requested records to analysis under KRE 507 rather than KRE 506.

privileged information from unnecessary over-disclosure. 122 S.W.3d at 564. That "*in camera* review of a witness's psychotherapy records is authorized only upon receipt of evidence sufficient to establish a reasonable belief that the records contain exculpatory evidence." *Id.* at 564. This preliminary showing is required to prevent defendants from engaging in purely speculative fishing expeditions and "unrestrained forays into confidential records in the hope that the unearthing of some unspecified information would enable the defendant to impeach the witness." *Id.* at 563 (internal quotation marks and alterations omitted).

With this in mind, we conclude that the trial judge acted within his discretion in finding that Sheets failed to proffer sufficient proof of a reasonable belief that the requested records would contain exculpatory or impeachment evidence. Sheets's motions simply asserted that he knew Michelle was receiving therapy from the CAC and that the records of such may contain information that may be exculpatory or useful in impeaching the minor witness, such as evidence showing that the alleged victim may have recanted or changed her story when discussing the allegations with CAC personnel. But he otherwise presented no actual basis to reasonably believe that the records would in fact contain such evidence outside generally speculating that they might. Under *Barroso*, this threshold showing was insufficient to overcome the privilege, as it would have been in most if not all other jurisdictions. *Cf.* Clifford S. Fishman, *Defense Access to Prosecution Witness's Psychotherapy or Counseling Records*, 86 Or. L. Rev. 1, 37 (2007) ("In sexual-assault and child abuse cases, there is general agreement that a defendant must do more than speculate that, because the complainant has participated in counseling or therapy after the alleged assault, the records in question might contain statements about the incident or incidents that are inconsistent with the complainant's testimony at trial.").

With Sheets thus having failed to make the requisite preliminary showing, the trial court did not err in denying his motion for *in camera* inspection of Michelle's psychotherapy records.

## H. Handgun Charge

As noted above, the trial court severed the handgun charge from the sex-related charges and held a separate trial with a separate jury. That jury found Sheets guilty and recommended a six-year prison sentence. The trial court thus entered a final judgment in that case, Kenton Circuit case number 13-CR-00187, sentencing Sheets in accordance with the jury's recommendation and ordering the sentence to be run consecutively to the sentence he received in the sex-crimes case, Kenton Circuit case number 13-CR-00186, subject to the statutory maximum aggregate sentence of seventy years under KRS 532.110(1)(c). Each case resulted in its own judgment. And Sheets filed separate notices of appeal for each case. Apparently due to clerical error, however, the two cases were improperly consolidated into this single direct appeal to this Court.

This was improper because Sheets's conviction and six-year prison sentence for possession of a handgun by a convicted felon was a completely separate judgment from that in the sex-crimes case. And while the appeal of the judgment in the sex-crimes case sentencing Sheets to ninety years subject to the statutory maximum aggregate sentence of seventy years is properly before this Court on Sheets's matter of right direct appeal, the handgun case is not because he received only six years' imprisonment under that judgment. *See* Ky. Const. § 110(2)(b). This Court simply does not have jurisdiction to hear

Sheets's direct appeal of the judgment entered in the handgun case. Instead, jurisdiction over that appeal necessarily lies with the Court of Appeals. *See* CR 73.01(2) (providing that all appeals not otherwise subject to matter-of-right review by the Supreme Court "shall be taken to the next higher court").

Of course, this Court could have granted, in its discretion, transfer of the handgun case from the Court of Appeals, CR 74.02(2), upon any party's motion, CR 74.02(1), or the recommendation of the Court of Appeals, CR 74.02(5). But that is not what happened here. There was no such motion or recommendation made in this case through which a transfer of direct-appeal jurisdiction to this Court could have been effected.

Therefore, we must dismiss Sheets's appeal of the handgun conviction and sentence and remand it to the Court of Appeals to properly exercise its direct-appeal jurisdiction over that judgment. *Cf. Leonard v. Commonwealth*, 279 S.W.3d 151, 156 (2009) (retaining jurisdiction over case because jurisdiction was proper when appeal was filed, although intervening gubernatorial action of commuting the sentence removed it from the Court's jurisdiction).

### III. CONCLUSION

Because the Court lacks jurisdiction over the direct appeal of the handgun conviction and sentence, the appeal of that conviction and sentence is dismissed and remanded to the Court of Appeals to properly exercise its direct-appeal jurisdiction over that matter. We reverse Sheet's conviction for sodomy based upon Michelle's oral contact with his penis and remand that matter to the trial court for further proceedings consistent with this opinion. We affirm Sheets's remaining convictions and their corresponding sentences.

All sitting. Minton, C.J.; Cunningham, Hughes, Keller, and Venters, JJ., concur. Noble, J., concurring in part, dissenting in part by separate opinion.

### NOBLE, J., CONCURRING IN PART, DISSENTING IN PART:

I agree that Sheets is not entitled to directed verdicts of acquittal. But I must otherwise dissent because the Commonwealth's questioning of Rhonda Sheets about her sexual activities with her husband, coupled with misleading questioning and closing argument about her cooperation with defense counsel's pre-trial investigation and subsequent loss of custody of her children, led to the admission of irrelevant testimony and was highly prejudicial. I disagree with the majority about the admissibility of much of the testimony elicited by that questioning, and I would find that the admission of the improper evidence amounted to palpable error requiring reversal and remand for retrial.

In my view, the greatest problem with the majority opinion involves the questioning related to Rhonda's use and cleaning of her various sex toys, particularly including the speculum. The majority concludes that this was not error because Rhonda's testimony in response was relevant since Michelle had possibly been infected with gonorrhea. In support, the majority cites Dr. Bennett's testimony speculating that if the sex toys had been used by others (who, presumably, were infected themselves), then the toys could have gotten infectious material on them and thus increased the risk of Michelle becoming infected. This fails to explain how Rhonda's use and cleaning of the sex toys had *any* tendency to prove or disprove whether Michelle had been infected with gonorrhea, which is the purported issue the majority finds established its relevancy. The fact is that her testimony says nothing about this issue. (Nor does the majority even attempt to

explain how the frequency of Rhonda's use of her sex toys, pornography, and lubricants made any relevant fact in contention any more or less likely.[7] Simply put, it does not.)

On top of this lack of probativeness, the majority's summary conclusion provides no reasoning how Michelle's infection with gonorrhea is actually relevant to proving the charges against Sheets. There was no evidence that either Rhonda or Sheets (or anyone else for that matter) had been infected with gonorrhea. At best, then, evidence of Michelle's infection prove d that she may have *somehow* become infected. It says nothing about how or by whom. So to the extent that Rhonda's testimony about her use of the sex toys and her washing of them had any relevancy at all, it was on a collateral issue that served no legitimate purpose in furthering the Commonwealth's cause against Sheets. The lack of probative value for proving, at best, a questionably relevant purpose was easily outweighed by the undue prejudice flowing from this improper line of questioning in casting Rhonda—and, by extension, Sheets—in an unflatteringly prurient light.

Similarly, the majority's conclusions as to the evidence of the speculum taken from Rhonda's gynecologist's office for use as a sex toy are also summary in nature and unconvincing. Despite acknowledging that the Commonwealth *conceded* the irrelevance of this evidence, the majority dismisses that concession on the ground that the contents of the sex-objects drawer, and when they were acquired, were relevant. This relevance supposedly arises because

of Sheets's defense that Michelle had made false allegations against him based on her knowledge of certain of her mother's sex toys that she likely acquired by snooping around in the couple's bedroom. But Rhonda was not questioned about each and every item found in that drawer or when any of these items were obtained. In fact, there was no testimony as to when even the speculum itself was obtained. How can this testimony about the speculum be relevant to proving when the numerous items found in the drawer were acquired if it did not even establish when the speculum was acquired? Similarly, Michelle too was not questioned about her knowledge of each and every item found in the drawer, but only those items she alleged Sheets used on her.

The reasoning underlying the majority's conclusion, then, would appear to be: because Michelle did not allege that Sheets used each and every item found in the couple's drawer on her, then his defense—that she obtained, by snooping around on her own, knowledge of those items which she did allege were used on her—must be false. This non sequitur highlights the flaws in the majority's analysis.

And while I disagree with most of the majority's individual conclusions as to relevancy, I admit that in other instances the majority's conclusions, viewed in a vacuum, seem correct on their face. For example, the majority explains how responses from Rhonda disclaiming any knowledge of Sheets's having ever given her son pornography or condoms (but confirming them having talked about sex and girls) were

---

7. After conceding that the proof of the speculum and the questions involving Rhonda's son were irrelevant and should not have been admitted, the Commonwealth asserts in its brief that the evidence of the frequency of Rhonda's use of the sex toys was relevant "because not only did [Michelle] testify that Sheets used one of these toys, 'a silver vi-

brator[;]' on her vagina, there was also the issue of whether [Michelle] had seen these sex toys on her own or had been shown them by Sheets." Like the majority opinion, however, the Commonwealth does not (and cannot) explain what exactly the frequency of Rhonda's use of the sex toys says about those disputed issues. The answer to that question: nothing.

"actually helpful to his defense," thus obviating any reason to object to them and showing that the failure to do so was reasoned trial strategy. I do not have major qualms with the majority here in the abstract, but that is only true when the line of questioning at issue is considered in isolation.

However, when this irrelevant questioning about Sheets's interactions with her son are considered in context with the entire course of questioning about the couple's sexual proclivities—and with the totality of Rhonda's examination, which became largely geared toward attacking her credibility to nullify her testimony about disbelieving her daughter's allegations— the majority's analysis falls apart. It ignores that the Commonwealth engaged in an inappropriate line of questioning that, combined with its continuous assault on the witness's credibility, in effect served to prove the impermissible assertions that its questioning might have, in a technical sense, failed to prove.

The majority's endeavor to walk through the Commonwealth's questioning of Rhonda piece by piece, characterizing particular questions and answers as proper or otherwise non-prejudicial, strains the meaning of "relevant" beyond recognition and, in doing so, misses the forest for the trees. As a consequence, the majority allows for the admission of what is at best marginally relevant collateral evidence that in no way serves to prove any fact of actual consequence and that, by its very nature, is unduly prejudicial.

In determining whether the erroneous questions warrant reversal, it is of course correct that defense counsel's failure to object to these questions is an important factor in our review. But that factor comes into play only when deciding whether the questions, once found to be error, require reversal: if no objection was raised to the objectionable matter, instead of analyzing whether the error is harmless, we must decide whether it amounts to palpable error. Whether defense counsel objected plays no role, however, in determining whether the complained-about matter constitutes error in the first instance, as some of the majority's discussion about trial strategy suggests.

As in its relevance analysis, the majority's palpable-error analysis is essentially no more than a conclusory holding that there was none. This is largely because the majority does not consider much of the improper questioning to be error at all. But the majority further fails to appreciate the degree of prejudice flowing from the presentation of this evidence, which many, if not most, jurors would likely consider salacious. And the prejudicial nature of this evidence is particularly acute when considered in the full context of the Commonwealth's examination of Rhonda.

The majority's resolution seems to instead turn largely on its view that the Commonwealth's questions were "not confrontational" and purportedly were "asked for purposes of clarification rather than sensationalism," along with insisting that trial strategy explains the lack of any objections. Based on my own view of the video, I do not perceive the questions to be for clarification of any salient point. And whether the prosecutor was confrontational in demeanor or not, the questions were asked during a confrontational cross-examination.

More to the point, though, I am left asking: How is the steadied poise of the prosecutor in maintaining a non-confrontational demeanor while examining a witness relevant to deciding whether a line of improper but unobjected-to questioning warrants reversal? It should be clear it is not. (Indeed, it seems to me that improper questions asked in a non-confrontational

manner might actually result in a more insidious error, considering that an overly confrontational prosecutor risks turning off the jury, thereby undercutting the effectiveness of his examination of the witness.)

Similarly, why should the prosecutor's subjective purposes for asking such questions, be they innocent or ill-intentioned, factor into the analysis? Again, it is clear they should not. An error is an error. With the exception of certain claims of intentional or flagrant misconduct, whether an erroneous line of questioning should be deemed to have resulted in manifest injustice—that is, "probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law," *Martin v. Commonwealth,* 207 S.W.3d 1, 3 (Ky.2006)—has nothing to do with what the questioner was thinking when he chose to ask such questions.

And I take issue with the view that defense counsel's failure to object was appropriate trial strategy. Even if it was, trial strategy is not a basis to overlook error *on appeal,* but rather is appropriate on an ineffective-assistance-of-counsel claim—which is not what is before us here.

In any event, as the majority explains it, because objecting too often may cause the jury to form negative impressions of the objector, counsel often forgo raising valid objections when the perceived harm from the objectionable evidence is something less than "significant." Thus, the majority's reasoning continues, since defense counsel did not object to the questioning here, he was presumably of the opinion that it was not particularly harmful, and therefore this Court would be "hijacking" defense coun-

sel's trial strategy if it were to reach a conclusion to the contrary. Boiled down, this circular logic suggests that there cannot be palpable error precisely because defense counsel did not object. Of course, that cannot be the answer, given that palpable-error review is triggered only when a particular error is not preserved through contemporaneous objection.

In contrast, I believe that this improper line of questioning was, by its nature, very damaging. So damaging, in fact, that notwithstanding the relative brevity of the offensive questioning, it calls into question the fundamental fairness of the entire trial.

I therefore disagree with the majority holding that this evidence was not irrelevant character evidence that ordinarily would have been barred by KRE 404(b). It undeniably was. It was evidence of "bad"[8] conduct introduced for no purpose other than to show Sheets's and his wife's sexual proclivities—that is, that they had a propensity for behaving sexually in ways that some might find unusual. It served only the impermissible purpose of showing the couple's purportedly debaucherous relationship to further demonstrate Sheets's (and his wife's) character for sexual deviance. And though the "bad" acts were legal, that character for deviance was further used to show—or could readily have been viewed by an unsympathetic jury as showing—an increased likelihood of Sheets's having committed the alleged illegal conduct. Thus, it is inadmissible.

The prejudice of this cannot be trivialized given the offenses Sheets was charged with committing and the reality that the proof of his guilt was far from overwhelm-

---

**8.** I use this term loosely. KRE 404(b) is not limited to unlawful conduct. The uncharged sexual conduct here is considered bad because of its tendency to cast the actors in an unflattering, even contemptible, light in the

eyes of at least some members of the jury. Thus, it is other-bad-acts character evidence that is inadmissible absent it being offered for some other permissible purpose under KRE 404(b)(1), which it was not.

ing. And the evidence, through similarly compromising Rhonda's character in the eyes of the jury, also had the incidental effect of prejudicing the jury against her as a witness and her testimony about her belief that her daughter's allegations were fabricated.

In reviewing for palpable error under Criminal Rule 10.26, "[t]o discover manifest injustice, a reviewing court must plumb the depths of the proceeding, ... to determine whether the defect in the proceeding was shocking or jurisprudentially intolerable." *Martin*, 207 S.W.3d at 4. The "focus is on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Id.* at 5. In light of the evidence and circumstances of this case, I am convinced that standard is met here.

This case was really no more than a "he-said, she-said" fight, as is lamentably often true in child-sex-abuse prosecutions. There was no physical evidence of abuse (aside from the inconclusive gonorrhea evidence, which essentially proved nothing at all, at least with respect to Sheets). Nor were there any witnesses to any abusive acts or behaviors. Instead, there was only the alleged victim's testimony and the alleged perpetrator's denials (and supportive testimony from his wife, the alleged victim's mother), so the jury's task thus boiled down to deciding whom to believe.

To that end, the Commonwealth's strategy at trial was clear: convince the jury to believe and sympathize with the alleged victim by painting Sheets (as well as his wife) as prone to sexual deviance, with Michelle thus having been subjected to his "world of sexual perversion," as the Commonwealth described it in closing argument. The Commonwealth carried this off quite effectively by giving the jury, through Rhonda's improper testimony, a voyeuristic view into the normally sacrosanct privacy of the marital bedroom.

Indeed, the speculum evidence is particularly troubling in this respect because it involved sexual activities that would be likely to be viewed as unusual, to say the least. Such evidence served as a powerful reinforcement of the picture of sexual perversion the Commonwealth was painting of Sheets (and Rhonda as well). And its prejudicial effect cannot be deemed ameliorated, as the majority apparently sees it, by its relative brevity because the Commonwealth made sure to draw the jury's attention back to the speculum in closing arguments as part of its emphasizing a perception of sexual depravity permeating the Sheetses' household.

The problem, then, lies in giving the jury a glimpse of the goings-on in the Sheetses' marital bed, goings-on that were completely unrelated to the charged offenses or any fact of consequence at trial. This exposed the jurors to indelible images of Sheets and his wife engaging in uncommon sexual behaviors that some of the more prudish of the panel might even deem abhorrent. Having demonstrated Sheets's predisposition to achieving sexual gratification through uncommon means, the Commonwealth improperly invited the jury—offended and inflamed by mental images of Sheets's and his wife's sex acts—to convict him based on its perception of that predisposition and not on the actual evidence presented of his guilt or innocence of the charged crimes.

Furthermore, the prejudice of introducing this inflammatory evidence was compounded by the Commonwealth's largely improper impeachment of Rhonda Sheets on the collateral matters of losing custody of her children and her cooperation with defense counsel's pre-trial investigation of Michelle's allegations. This point is yet

another on which I disagree with the majority.

As I viewed the examination of Rhonda, I was struck by the aggressive impeachment (purporting to demonstrate bias for her husband and against her daughter) of the witness on redirect on entirely collateral issues.

Yet the majority dispenses with this allegation of error, in part, by signing off on the trial court's conclusion that defense counsel "opened the door" to such questioning regarding Rhonda's losing custody of her children. That seems to have been premised, however, on a fundamental misconception of the "opening the door" concept, which is more aptly termed the doctrine of "curative admissibility." *E.g., Norris v. Commonwealth*, 89 S.W.3d 411, 414 (Ky.2002). This doctrine is triggered when one party introduces *inadmissible* evidence that prejudices the other party in some way—this "'opens the door' for the other party to introduce equally inadmissible evidence in rebuttal." *Purcell v. Commonwealth*, 149 S.W.3d 382, 399 (Ky.2004), *overruled on other grounds by Commonwealth v. Prater*, 324 S.W.3d 393, 400–01 (Ky.2010).[9] And it should be emphasized that "[t]he open door doctrine is supposed to prevent prej-

udice (not to introduce or exacerbate it)." *Id.* (quoting Robert G. Lawson, The Kentucky Evidence Law Handbook, § 1.10[5], at 46 (4th ed. 2003)).

So the concept should apply here only if Rhonda's responses to defense questioning contained inadmissible, prejudicial evidence—only then would it be subject to rebuttal by equally inadmissible evidence to mitigate the prejudicial taint of the improperly introduced evidence. *See Norris*, 89 S.W.3d at 415 ("Concerning curative evidence, ... 'the opponent may reply with similar [inadmissible] evidence *whenever it is needed for removing an unfair prejudice which might otherwise have ensued from the original evidence.*'" (quoting *Dewey v. Funk*, 211 Kan. 54,505 P.2d 722, 724 (1973) (bracketed language in original))). Failing to appreciate this, however, the majority never attempts to explain how the fairly offhand mention [10] by Rhonda of losing custody of her children was inadmissible, let alone prejudicial, to warrant the extensive redirect examination by the Commonwealth. Nor could the majority possibly supply such an explanation because the original testimony was not inadmissible (in the sense that improper hearsay or character evidence is inadmissi-

---

9. In *Prater*, this Court clarified that trial courts have discretion whether to allow impeachment by extrinsic evidence on purely collateral issues when a party raises them on direct examination, overruling *Purcell* and other cases to the extent they suggested that trial courts lacked such discretion. 324 S.W.3d at 400–01. We explained that "the trial court is in the best position to decide whether the facts and circumstances of that case present a scenario in which the evil of allowing a party to offer voluntarily what may be knowingly false testimony with impunity outweighs the evil of having to devote trial time to impeachment on collateral matters." *Id.* at 401. Of course, that scenario is not implicated here where it was never alleged that Rhonda's testimony regarding the custo-

dy of her children was untrue and the Commonwealth's questioning on redirect examination was not "impeachment" in the sense that it attacked the truthfulness of such testimony.

10. And that is all it was. The exchange, which purportedly "opened the door" to the Commonwealth's questioning on redirect examination, went as follows:

Defense Counsel: Are you fighting for custody of your children?
Rhonda: Yes.
Defense Counsel: They are in the custody of your parents right now, correct?
Rhonda: Yes.

ble) or prejudicial to Commonwealth's case.[11]

As Professor Lawson has observed, this Court's past cases suggest our embrace of the view that "all evidence that properly serves to counter the inferences generated by the original evidence should be admissible, but none other." Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 1.10[4], at 45 (5th ed. 2013) (quoting 1 Wigmore, *Evidence in Trials at Common Law*, § 15 (Tiller's rev. 1983)). What inferences were generated by the original testimony here? How did the Commonwealth's follow-up questioning (and argument) serve to counter those inferences? When this issue is thus properly framed, it is clear that Rhonda's brief testimony "did not open the door to the storm of evidence that followed." *Sanborn v. Commonwealth*, 754 S.W.2d 534, 548 (Ky.1988). That storm—the improper questioning and subsequent closing arguments—was both highly prejudicial and misleading.

To be sure, this questioning and argument is most concerning when it is viewed in tandem with the improper sex evidence, especially considering the he-said-she-said nature of the proof in this case. In short, the prosecutor was allowed to attack Rhonda's maternal judgment through questioning that misleadingly implied (or, perhaps more accurately, led the witness to answer misleadingly, if not counterfactually) that the family court had removed the children from her custody because she

had allowed them to speak with Sheets's counsel.[12] (E.g., Commonwealth: "[You took your children to meet defense counsel i]n preparation for trial, is that correct?" Rhonda: "This was a while ago, yes." Commonwealth: "And, at that point, your children were taken away?" Rhonda: "Yes.") It is not proper impeachment to question a witness in such a way as to mislead jurors, particularly when on a collateral and irrelevant, yet prejudicial, matter. The record makes clear that this is exactly what happened.

Turning back to why this questioning (and accompanying closing arguments related to it) was problematic: this attack made the taint of the improper sex evidence much more pronounced. It allowed the Commonwealth to be that much more successful in painting the Sheetses' residence as a "world of sexual perversion," where Michelle's well-being was allegedly overlooked and ignored or, if the Commonwealth's theory was correct, intentionally damaged by Sheets.

In sum, it is clear to me that the Commonwealth's introduction of the irrelevant sex evidence here served no proper purpose and instead only inflamed the passions of the jury. Coupled with the improper impeachment of Rhonda on the collateral issues of her children's custody and defense counsel's investigation of Michelle's allegations, it casts doubt on the fundamental fairness of Sheets's trial as a whole. So I must conclude that the intro-

11. Indeed, the majority's alternate conclusion that this questioning was proper impeachment (purportedly to show bias) is in direct conflict with its invocation of the open-door doctrine, which again involves curative admissibility of otherwise inadmissible evidence. If the redirect examination questioning here really was a proper means for showing bias (which I dispute), then whether the defense "opened the door" on that topic is irrelevant.

12. It appears, instead, that the Kenton Family Court removed the children from Rhonda's custody because she violated that court's order that she have no contact with Sheets. In his brief, Sheets's counsel also complains about an order of the family court barring Rhonda from further contact with defense counsel issued after the family court learned of her cooperation with the defense investigation. Whether or not the family court acted appropriately is not before this Court.

duction of the inadmissible evidence was palpable error that threatened Sheets's entitlement to due process of law and resulted in manifest injustice warranting reversal.

Therefore, I would reverse all of Sheets's convictions and remand for a new trial.